UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

United States of America

          v.

Cameron Stroke,

                    Defendant.

**Decision and Order**
14-CR-45S

---

I.     INTRODUCTION AND BACKGROUND

Defendant Cameron Stroke ("Stroke") faces five charges of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). (Dkt. No. 11.) Many of the details leading up to those charges appear elsewhere in the record and are not relevant to the narrow issue that the Court is addressing today. There is one set of details that the Court does need to discuss briefly, because it affects a discovery issue that the Court has struggled to resolve—whether to reopen the suppression hearing a second time to obtain testimony from a now-retired New York Assistant Attorney General. That set of details concerns certain events that occurred in connection with the New York State Attorney General's regional office in Albany, New York.

During the pre-indictment investigation of Stroke, the National Center for Missing and Exploited Children ("NCMEC") transmitted four reports called CyberTipline Reports to New York State's Internet Crimes Against Children Task Force (the "Task Force"). Every state has its own version of the Task Force to receive reports from NCMEC. The New York State Police ("State Police") runs New York's Task Force, and the Task Force's office happens to be in Albany. Among other functions of the Task Force, "[o]nce Albany receives the tip [of a potential crime] they then try to determine, again, [in] what area within New York State was the crime being

committed or where it was committed []. They do a bunch of research online attempting to discover a location, and routinely they send out subpoenas in order to try to determine the location of where the suspect committed the crime." (Dkt. No. 42 at 15.) Two subpoenas duces tecum did issue by email in this case, returnable before the Supreme Court Grand Jury of the County of Albany. Assistant Attorney General Nancy Snyder ("Snyder") signed both of them. One subpoena went to America Online, Inc. (Dkt. No. 35-5 at 2) and prompted a response the same day. The other subpoena went to Verizon (Dkt. No. 35-6 at 2); Verizon also responded promptly. The responses to the subpoenas eventually led State Police investigator Scott Folster ("Folster") and two other agents to visit Stroke at his residence on January 25, 2011. A series of events occurred on January 25, 2011, most of which are not relevant for the narrow purposes of this Decision and Order. What is relevant is that Folster, though convinced already that Stroke had committed a crime (Dkt. No. 42 at 84), went to Stroke's residence with a voluntary "knock and talk" interview in mind.

Stroke's pretrial motion to suppress evidence (Dkt. No. 35 at 19)—whose substance the Court will not address here to keep this Decision and Order non-dispositive—consistently has attacked the Albany grand jury subpoenas as illegal, and Stroke has sought to obtain Snyder's testimony as part of the pretrial record. As far back as the original motion, Stroke requested a "hearing to determine the procedures used by the New York State Attorney General." (*Id.*) The Court conducted the initial suppression hearing without Snyder's testimony but then issued an Electronic Text Order on January 25, 2016 that requested supplemental briefing for the following questions:

> 1) Was an Albany County grand jury actually convened to investigate defendant? Alternatively, did an already-impaneled grand jury in Albany County ever review any information pertaining to defendant?
>
> 2) If conducted properly, a "knock and talk" interview by itself does not appear to require subpoenas or warrants. *See, e.g., U.S. v. Titemore*, 335 F. Supp. 2d 502, 505 (D. Vt. 2004). Given the amount of identifying information about defendant that appeared in the NCMEC reports, were the Albany County subpoenas a legal or factual prerequisite to the knock and talk interview? Put another way, under the inevitability doctrine or some analogous principle, would the events of this case from January 25, 2011 onward look any different if the Albany County subpoenas had issued from Erie County or not at all?

(Dkt. No. 92.) Following a status conference, the parties filed a stipulation on March 11, 2016 that addressed the questions from the Court's Order. (Dkt. No. 100.) The parties' joint answer to the first question was that, while an Albany County grand jury was convened at the time of the subpoenas, it was not convened to investigate Stroke, and it never in fact reviewed any information pertaining to Stroke. (*Id.* at 1.) The parties stated different positions with respect to the second question; Stroke believed that the record needed further development to answer the question. (*Id.* at 2.)

On March 22, 2016, the Court issued a Decision and Order that reopened the suppression hearing to address the following issues:

> Whether the Albany County grand jury subpoenas were a factor in the decision to conduct a "knock and talk" interview on January 25, 2011;
>
> Whether the Albany County grand jury subpoenas were presented or otherwise discussed during the search warrant applications to West Seneca Town Court; and
>
> If the Albany County grand jury subpoenas were not presented or otherwise discussed, whether the search warrant applications to West Seneca Town Court contained information that was available only from the subpoenas.

(Dkt. No. 101 at 3.) The supplemental hearing occurred on May 12, 2016 with additional

testimony from Folster. Folster confirmed that the Albany County grand jury subpoenas influenced his decision to conduct the "knock and talk" interview. As Folster explained,

> [I]f they didn't send a subpoena out to identify a specific location for the crime, the case probably would not have been referred to our office.
>
> It's very, very rare that they send a case out to us and only in extreme circumstances that they don't send a subpoena out first to identify a specific target.
>
> In addition to that, we typically don't want to go to a house that may not be involved in a crime; and also we want to know for officer safety reasons that we're not going into a place that—well, we want to know who at the house has prior offenses, are there any individuals there that have a history of violence.
>
> So we will do a bunch of research once we obtain a target address to identify who is residing there and who may be involved in a crime.
>
> So for officer safety reasons we want to know ahead of time before we go out and investigate these types of things.

(Dkt. No. 107 at 6–7.) Folster confirmed further that information from the Albany County grand jury subpoenas made its way into certain search warrants that were obtained as part of the investigation of this case. (*Id.* at 10.)

Based on Folster's supplemental testimony, Stroke renewed his efforts to obtain Snyder's testimony. On August 24, 2016, Stroke filed a motion to reopen the suppression hearing a second time to put Snyder on the witness stand. (Dkt. No. 109.) The Court denied the motion without prejudice for two reasons. "First, the parties already have stipulated to what the most important revelation in Snyder's testimony likely would be—that the Albany County grand jury, while available for a possible investigation, never actually investigated defendant, with a reasonable inference being that no prosecutor or law enforcement official ever intended to investigate defendant in Albany County." (Dkt. No. 115 at 3.) Second, the Court cited to several cases suggesting that violations of state law do not in themselves implicate the Fourth Amendment; the

4

Court then invited the parties to comment on those cases. (*Id.*; *see also* Dkt. No. 117.) At this point, the Court admittedly vacillated about Snyder's testimony while trying to find a balance between the implications of the cited cases and its general preference for a fully developed factual record. Following another status conference on November 30, 2016, the Court decided to permit Snyder's testimony after all, but on more limited grounds than Stroke had been arguing. (Dkt. No. 129.) Then a new wrinkle emerged: Snyder by then had retired, and the parties could not find her. After another status conference and a request from the Government to reconsider a second reopening, the Court decided to hold the issue of Snyder's testimony in abeyance while the parties went through one last round of briefing on the issue. The Court regrets any confusion that resulted along the way and now issues this Decision and Order to bring finality to the matter.

## II. DISCUSSION

The Court begins its assessment of a possible reopening with a general look at how violations of state law interact with the Fourth Amendment. The Fourth Amendment of course protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (internal quotation marks and citations omitted). Any analysis of personal security and arbitrary interference, though, has to occur from a federal perspective. The need for a federal

perspective is met most easily when defendants allege that federal law enforcement agents violated federal statutes or federal procedural rules. Criminal cases can implicate the Fourth Amendment also when state law enforcement agents obtain evidence in ways that would not have been available to federal agents. This principle emerged when the Supreme Court abolished the so-called "silver platter" rule. *See Elkins v. United States*, 364 U.S. 206, 223 (1960) ("[E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial."); *see also, e.g., United States v. Sotomayor*, 592 F.2d 1219, 1223 (2d Cir. 1979) ("There is an impressive line of authority to the effect that, in the area of search and seizure, it is federal law which controls the admissibility of evidence in a federal trial, even where the evidence has been obtained by state officers who may have violated state law.") (citations omitted). In contrast, the scope of the Fourth Amendment does not include violations of state law in themselves. *See Virginia v. Moore*, 553 U.S. 164, 178 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law. That Amendment does not require the exclusion of evidence obtained from a constitutionally permissible arrest."). The Fourth Amendment does not reach pure state-law violations partly because states are free to add protections to the federal constitutional minimum, and "when States go above the Fourth Amendment minimum, the Constitution's protections concerning search and seizure remain the same." *Id.* at 173; *see also California v. Greenwood*, 486 U.S. 35, 43 (1988) ("We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth

Amendment depends on the law of the particular State in which the search occurs."); *United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) (citations omitted).

The general principles outlined above have been applied numerous times, including in scenarios that share some traits with Stroke's situation. To the extent that Stroke has protested about geography—that is, the involvement of the grand jury from the Albany County and not Erie County—geographical issues arising under state law by themselves do not implicate the Fourth Amendment. *Cf. United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) ("Because we must examine Deputy Picou's stop of Jones under federal law, the state law administrative deficiency in his commission as Deputy Sheriff does not affect our analysis."); *see also Tucker v. Cty. of Jefferson*, 110 F. Supp. 2d 117, 123 (N.D.N.Y. 2000) ("The Fourth Amendment does not provide Plaintiff with additional protections merely because, at the time the warrant was to be executed, he was located in one county in the state as opposed to another. The federal constitution provides for a common denominator of rights to be applied across the country.") (citation omitted). Stroke has argued that he wants to cross-examine Snyder because "Ms. Snyder's testimony is necessary to establish whether her actions in issuing improper grand jury subpoenas were a deliberate improper and/or illegal act." (Dkt. No. 124 at 4.) Even so, Snyder's testimony would not be necessary because deliberate acts that are improper under state law do not themselves implicate the Fourth Amendment. *See United States v. Eastland*, 989 F.2d 760, 765 (5th Cir. 1993) ("The exclusionary rule is not a personal constitutional right , but is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect. The rule was not created to discourage violations of state law.") (internal quotation and editorial marks and citations omitted);

7

*United States v. Edwards*, 79 F. Supp. 2d 645, 651 (M.D. La. 1999). When state-level grand jury subpoenas violate state law, any evidence obtained from them does not have to be suppressed in federal court solely because of the state-law violations. *Cf. United States v. VanDyck*, No. CR 15-742-TUC-CKJ, 2016 WL 2909870, at *7 (D. Ariz. May 19, 2016) ("In essence, VanDyck complains that the grand jury subpoena was created by the detective and prosecutor, rather than the grand jury, and the state grand jury procedures were not complied with. Even if there has been a violation, VanDyck has not pointed to any federal authority determining that the appropriate remedy is the exclusion of evidence rather than civil litigation."). Here lies the difference between Stroke's arguments for reopening and the *Elkins* rule. Stroke is not arguing that Snyder invaded Stroke's reasonable expectations of privacy to obtain evidence that in itself constituted a Fourth Amendment search. He is arguing that Snyder obtained information that influenced certain Fourth Amendment events that occurred later.

From all of the above cases, one factual and one legal reason emerges as to why Snyder's testimony is not necessary. The factual reason concerns the stipulation that the parties filed on March 11, 2016. (Dkt. No. 100.) As the Court noted previously (Dkt. No. 115), the parties already have stipulated to the most important facts that would have emerged from Snyder's testimony and that would have served as the predicate for the analysis that the Court just concluded above. The NCMEC CyberTipline Reports contained extensive information about Stroke—information that, incidentally, turned out to be correct—that located him in Erie County. The only connection that this case ever had to Albany County is bureaucratic coincidence. The Task Force's office happens to be in Albany; if the office had been located in, say, Chenango

8

County then the parties would be arguing over grand jury proceedings in that county. When subpoenas issued in the name of the Albany County grand jury, a grand jury in that county happened to be in session for other reasons. However, that grand jury was never contacted for this case, with a reasonable inference being that no one ever intended to contact that grand jury for this case. The subpoenas prompted responses almost immediately, and the confirmation of Stroke's location eventually made its way to Folster. Everything that the Court just described is already known. At the very most, Snyder might add details about how frequently or routinely her office handled cases as it handled Stroke's case. Case management at the Attorney General's office in Albany might interest the state if Snyder's testimony were to uncover widespread state violations, and it might interest Stroke to the extent that he wanted to pursue some sort of civil litigation in state court. Even the most routine and widespread violations of state procedure, however, would not affect the two points in this case when the Fourth Amendment might be directly implicated: the "knock and talk" interview of January 25, 2011 and the warrantless seizure of Stroke's laptop later that evening.

The legal reason that makes Snyder's testimony unnecessary concerns the cases that the Court cited above. Suppose, in the most favorable possible scenario for Stroke, that Snyder testified and uncovered widespread, routine, indiscriminate abuse of grand jury subpoenas at the Attorney General's office in Albany. Those details might prompt outrage, internal investigations, and disciplinary action at the state level. Stroke possibly might consider civil litigation at the state level. Those details, however, would mean nothing to Stroke's federal case because they would not

demonstrate that Folster lacked the necessary level of suspicion[1] to conduct the "knock and talk" interview or to seize the laptop.  Stroke himself already has hinted at his real reason for wanting to cross-examine Snyder: He thinks that she is criminally liable for abusing the state grand-jury process and that, upon testifying, she needs to "be cautioned about her right against self incrimination."  (Dkt. No. 124 at 5.)  The Court does not need to comment on Stroke's view of Snyder except to reiterate its focus on the Fourth Amendment.  Folster either did or did not have the requisite level of suspicion for the "knock and talk" interview and the seizure of the laptop as of January 25, 2011.

In reaching the conclusion that Snyder's testimony is not necessary, the Court is trying to keep this Decision and Order as narrow as possible to keep it as a non-dispositive discovery order.  With respect to the substance of any pretrial motions, the Court will let the parties be heard one more time at an oral argument on June 1, 2017 at 11:00 AM.  Stroke remains free to make arguments about things that happened procedurally at the state level, either individually or through a "cumulative effect" that he has described before.  Stroke would do well, though, to focus on showing that any state-law violations meant that Folster lacked the necessary level of suspicion during the two events on January 25, 2011 that the Court has identified.

## III.  CONCLUSION

For all of the foregoing reasons, the Court reaffirms its prior decision (Dkt. No. 115) not to reopen the suppression hearing again, and this time with prejudice.

---

[1] The Court is intentionally using noncommittal language when describing this level of suspicion because, as recently as last week's oral argument, the parties still seemed unsure as to what level of suspicion might be necessary for a "knock and talk" interview.  To keep this Decision and Order narrowly focused, the Court will let the parties argue that issue one more time at another oral argument.

Additional oral argument will occur on June 1, 2017 at 11:00 AM.  Speedy-trial time remains excluded because Stroke's pretrial motions remain pending.

SO ORDERED.

    /s Hugh B. Scott
Honorable Hugh B. Scott
United States Magistrate Judge

DATED: April 25, 2017