UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

**Report and Recommendation**

v.

14-CR-45S

Cameron Stroke,

Defendant.

## I.    INTRODUCTION

Defendant Cameron Stroke ("Stroke") allegedly visited AOL and MyYearbook online

discussion boards in 2009 and 2010 and posted messages encouraging girls under 18 years of age

to contact him for sexually explicit communications and activity.  Other users complained about

the messages, and the complaints eventually made their way to law enforcement.  A background

investigation led to an interview of Stroke at his apartment by law enforcement officers on January

25, 2011.  During the interview, Stroke confirmed his ownership of a particular email address

connected to the messages, confirmed that he had made online postings as recently as the previous

weekend, and confirmed that a laptop sitting on a coffee table in the apartment was the sole

computer that he used for his online postings.  Fearing possible destruction of evidence, the

officers seized the laptop without a warrant and took it into their custody.  After obtaining two

search warrants for the contents, officers found child pornography on the laptop.  Stroke now

stands charged with five counts of possession of child pornography in violation of 18 U.S.C.

§ 2252A(a)(5)(B).

Stroke has moved to suppress evidence obtained from the laptop. (Dkt. No. 35 at 19–21; Dkt. No. 83.) Stroke argues that the officers lacked exigent circumstances to seize the laptop, which in turn taints the subsequent searches of the laptop's contents. On a deeper level, Stroke argues that the seizure and later searches of the laptop were tainted by a "cumulative effect" of errors in state procedural law, including defects in certain grand jury subpoenas that set up the January 25, 2011 interview; failure to consider an electronic search warrant instead of a warrantless seizure of the laptop; and failure to obtain permission from state court to transfer custody of the laptop to federal law enforcement agents. The Government counters that the officers reasonably feared destruction of evidence if they had left the laptop and Stroke's possession. The Government argues further that the searches of the laptop's contents properly followed a valid search warrant that the officers used in good faith. Finally, the Government asserts that any purported violations of state procedural law do not in themselves implicate the Fourth Amendment.

For the sake of a full record, the Court entertained oral arguments, suppression hearings, and supplemental briefing on multiple dates, with the last supplemental briefing arriving on September 4, 2018. As it has before, the Court thanks the parties for their diligence in developing the record, particularly with respect to an unusual issue concerning injunctions that the Court will explain further below. After considering the entirety of the record including the testimony from the suppression hearings, the Court respectfully recommends granting Stroke's motion.

II.     BACKGROUND

A.     *Initial Events*

This case concerns allegations that Stroke attempted to draw minors into sexually explicit online conversations, and that an investigation of those conversations uncovered child pornography in his possession.  While the substantive events of this case unfolded, Stroke worked as a data entry clerk for Citigroup, processing passports for the Department of State.  (Dkt. No. 46 at 5.)  Defendant worked nights; his shift began at 9:30 PM and ended at 7:00 AM.  (Dkt. No. 46 at 5.)

The events of this case began with certain online postings that drew complaints.  For just a few examples, around July 2, 2010, someone with the screen name <thirteenrez> and the email address <thirteenrez@aol.com> visited an AOL message board titled "Dating younger/older" and posted a message that read, "looking for an open-minded single mommy who'd like their young daughter be given special attention 29/m/ny [sic]."  (Gov't Ex. 2A at 2 (lowercase in original).)  In 2009 and 2010, someone with the screen name <sexyguy> and the email address <thirteenrez@aol.com> visited a different discussion board and posted messages such as, "hey girls, i would love to eat out your pussy!  get at me my email is thirteenrez@aol.com" [sic] and, "im a 29/m/ny and i like younger girls... any girls wanna chat?  email me thirteenrez@aol.com" [sic].  (*Id.* at 5.)  An anonymous user complained to AOL on July 2, 2010 about the message from that date quoted above.  (Gov't Ex. 2B at 2.)  Meanwhile, around August 4, 2010, someone with the identity <cameron s [Age: 17] (thirteenrez@aol.com)> communicated on the MyYearbook social media website and posted the following: "hey im cameron, im actually 29 but i like younger, u ever been

curious about bein w/an older guy? [sic]" (Gov't Ex. 2C at 3.) That posting generated a complaint from an identified MyYearbook user in Pennsylvania. (*Id.* at 2.) Upon receiving the complaints, the Internet service providers in question investigated any screen names, IP addresses, and email addresses associated with the postings.

B.    *Involvement of NCMEC*

The information from the Internet service providers eventually made its way to the National Center for Missing and Exploited Children ("NCMEC"). "NCMEC [sic] what they do is they take—take these cyber tips, and the tips could be from an anonymous person, they could file a report online or via the phone; or it could be that a tip comes in typically from an internet content provider, like America Online or Yahoo! or Google. They're mandated to report when they discover child pornography or somebody soliciting children online." (Dkt. No. 42 at 14.) NCMEC, in turn, prepared four reports called CyberTipline Reports. Report Number 917626, with an entry date of July 2, 2010, covered certain message board postings detected from IP address 75.118.164.35 and email address <thirteenrez@aol.com>. (*See* Gov't Hg. Ex. 2A; Dkt. No. 35-2.) The report contains information that NCMEC conducted an Internet search for this email address and found a profile that contained Stroke's full name. NCMEC conducted further email searches using Stroke's name and email address and "found a possible target name of Cameron Stroke, a location of Buffalo, NY and a birth date of March 22." (Gov't Hg. Ex. 2A at 6.) NCMEC conducted further searches of Stroke's name and included his full birth date, age, and Social Security number in the report. The report also included two likely residential addresses. An older address, listed as current from 1999 to 2008, came from Wyoming County. The newer

address, current since 2007, was Stroke's actual address and the address that was eventually visited: an address for an apartment in West Seneca, New York. The report even included a telephone number associated with the West Seneca address. A second NCMEC report, bearing Report ID 917641 and entry date of July 2, 2010, contained the same information about Stroke. (*See* Gov't Hg. Ex. 2B; Dkt. No. 35-1.) A third NCMEC report bore Report ID 930998 and an entry date of August 5, 2010. (*See* Gov't Hg. Ex. 2C.) This report again contained Stroke's name, email address, and birth date; it also contained a head-and-shoulders picture of Stroke. A fourth NCMEC report, with an entry date of August 11, 2010, was nearly identical to the third and bore Report ID 934370. (*See* Gov't Hg. Ex. 2D.)

C.      *Events in Albany*

NCMEC transmitted its reports to New York's Internet Crimes Against Children Task Force (the "Task Force"). Every state has its own version of the Task Force to receive reports from NCMEC. The New York State Police ("State Police") runs New York's Task Force and maintains its headquarters in Albany. In general, "[o]nce Albany receives the tip they then try to determine, again, what area within New York State was the crime being committed or where it was committed at. They do a bunch of research online attempting to discover a location, and routinely they send out subpoenas in order to try to determine the location of where the suspect committed the crime." (Dkt. No. 42 at 15.)

Sometime after the State Police received NCMEC reports, the reports made their way to the New York State Attorney General's office in Albany. Assistant Attorney General Nancy Snyder ("Snyder") obtained the NCMEC reports and determined that she needed to verify the

subscriber for both the AOL email account and the Verizon Internet connection referenced in the reports. Snyder drafted and issued two subpoenas duces tecum, in the name of the Albany County grand jury, to AOL and Verizon. The AOL subpoena was dated July 12, 2010. (Gov't Ex. 14.) The AOL Legal Department responded on July 15, 2010 and confirmed that Stroke was the subscriber for the email address in the NCMEC reports. (Gov't Ex. 15.) The Verizon subpoena was dated July 23, 2010. (Gov't Ex. 16.) Verizon Legal Compliance responded the same day and confirmed that Stroke was the subscriber for the Internet connection and the residential address listed in the NCMEC reports. (Gov't Ex. 17.)

The propriety of the Albany County grand jury subpoenas has been litigated extensively, and the Court will not repeat arguments, filings, and findings that appear in the record already. For the sake of completeness of this writing, however, a brief recitation of key facts is warranted. Stroke has argued that the Albany County grand jury subpoenas were defective because nothing in the NCMEC reports pointed to any potential criminal activity occurring in Albany County. The Albany County grand jury, according to Stroke, thus lacked jurisdiction to issue subpoenas in any investigation of Stroke. Stroke then has continued from that point to certain other legal arguments that the Court will address below. The Government has defended the Albany County grand jury subpoenas by arguing, *inter alia*, that Stroke lacks standing to challenge them and that the Albany County grand jury subpoena would have had the authority to investigate Stroke to rule out any criminal conduct from him within its jurisdiction. The propriety of the Albany County grand jury subpoenas assumed heightened importance for Stroke because State Police Investigator Scott Folster ("Folster") testified, during a supplemental portion of the suppression hearing, that

the subpoenas were a factor in persuading him to conduct the interview that eventually occurred. "[I]f they didn't send a subpoena out to identify a specific location for the crime, the case probably would not have been referred to our office . . . . In addition to that, we typically don't want to go to a house that may not be involved in a crime; and also we want to know for officer safety reasons that we're not going into a place that—well, we want to know who at the house has prior offenses, are there any individuals there that have a history of violence." (Dkt. No. 107 at 6–7; *see also id.* at 9 ("Would I have felt comfortable going to that location just based on the information that was provided without the exact location, the definite location of Mr. Stroke's residence? I would feel comfortable going there and talking to him. But, again, I wouldn't have known that we weren't going to the—that we were knocking on the wrong door and going and speaking to someone that wasn't involved in the case.").) Folster testified further that information from the grand jury subpoenas made its way into both search warrant applications. (*Id.* at 10.) Folster never received any information that any criminal activity actually happened in Albany County. (Dkt. No. 42 at 77.)

As the Court has written before, the parties filed a joint stipulation on March 11, 2016 addressing two issues that the Court raised about the Albany County grand jury subpoenas. (Dkt. No. 100.) In short, the parties stipulated that an Albany County grand jury was in session at the time when the subpoenas issued, but that the grand jury never actually reviewed any information concerning Stroke. From there, the Court has inferred that neither Snyder nor any investigators ever intended to present information about Stroke to any Albany County grand jury. (*See also* Dkt. No. 90 at 3 ("[T]here is no indication that after the case was transferred to Investigator Folster's

office on July 26, 2010, that the AAG or any other law enforcement entity in Albany County remained involved in the investigation.").) The Court reasoned previously that the city of Albany, New York had no connection to this case except that the State Police office that receives NCMEC reports just happened to be located in Albany. (Dkt. No. 140 at 8–9.)

D.    *The Interview of January 25, 2011*

The NCMEC reports eventually made their way to Folster, a 24-year veteran of the State Police. Folster had been assigned to the Computer Crime Unit located at Troop A headquarters in Batavia, New York. The Troop A Computer Crime Unit covers the eight westernmost counties of New York; it can initiate its own investigations but also acts on referrals from the Task Force. Folster adopted the investigation on July 28, 2010. (Dkt. No. 42 at 16–17; Dkt. No. 85 at 38.) Based on the dates of the NCMEC reports, the referral to Folster at least initially would have consisted of the first two reports.[1] Folster's role in the investigation consisted of finding some additional online postings and attempting an undercover contact through Stroke's email address. When Folster received no response by September 8, 2010, he turned the investigation over to local law enforcement. "With our office the way that we're set up, we don't fully investigate cases that come in. We bring the referrals in, we attempt to get more evidence or more background information regarding an investigation, and then we try to have either another investigator from our agency or another police department, depending on where the case is being investigated, try to

---

[1] Folster's memory was questionable regarding the early chronology of his investigation. Folster testified that he received the referral from the Task Force by late July 2010. He also testified that the third and fourth NCMEC reports were "included in the package that was sent to you when you started your investigation." (*See* Dkt. No. 42 at 19:18–21, 20:15–17.) That is not possible given the entry dates of the third and fourth reports.

turn the case over to them to investigate because we are overwhelmed with cyber tips and conducting forensics and online undercover investigations." (Dkt. No. 42 at 22.) The West Seneca Police Department agreed to take over the investigation.

On January 25, 2011, around 6:30 PM,[2] Folster went to Stroke's house to engage him in a "knock and talk" voluntary interview. Folster went with State Police Investigator John Lombardi ("Lombardi") and West Seneca Police Detective Kenneth Morano ("Morano"). The officers decided on a voluntary interview at first because they acknowledged that the initial information about Stroke had grown stale: "It had been several months since all these reports were coming in and I didn't see any additional reports come in so I wasn't sure whether he was continuing his effort or if he had stopped at that point in time." (Dkt. No. 42 at 25.) At this point, Folster already had made up his mind that a crime of some sort had occurred. (*See id.* at 84.) Folster and the officers nonetheless did not believe that they had probable cause to arrest Stroke as of the beginning of the interview. "Before we went to Mr. Stroke's apartment, we had indications that a crime had occurred using an IP address that Mr. Stroke was leasing and we had indications that someone using the name Cameron Stroke, using his photograph. But other than that, we had no admissions from him that he had committed a crime; and it was possible that somebody else had committed the crime other than him using his name." (Dkt. No. 43 at 33.) Given the passage of several months, Folster also wanted "to determine if he [Stroke] was still trying to seek out children online for what I believe to be—to engage in some type of sexual intercourse with these

---

[2] (*See also* Dkt. No. 64 at 39.) Stroke recalled the interview beginning around 7:15 PM. (Dkt. No. 46 at 41.) The Court finds that 6:30 PM was the more likely time but that the discrepancy between the parties is immaterial.

children." (Dkt. No. 42 at 24.) Lombardi agreed that the case needed further development. "[T]he field interview is designed that the point is that we're going out to speak to somebody at the time to gather additional information to facilitate our investigation . . . . A knock and talk is generally conducted in lieu of a search warrant if there's not information to—to gain a search warrant." (Dkt. No. 63 at 12.)

The parties are in agreement on some details of the interview. The officers were not in uniform but had their weapons; Lombardi was wearing a "raid jacket" with lettering, and Folster and Morano might have been dressed similarly. (Dkt. No. 63 at 44–45; *see also* Gov't Hg. Ex. 9B.) The officers stood at the security entrance to Stroke's building and rang the doorbell for Stroke's apartment. Stroke could have opened the security door remotely but decided to walk to the door. Stroke could see the officers through a glass door at the security entrance. (Dkt. No. 46 at 6.) Lombardi showed Stroke his badge and asked if they could talk to him. Stroke opened the door, and the officers proceeded to Stroke's apartment and to position themselves in different areas of the apartment to look around. (Dkt. No. 46 at 8.) Stroke testified that the interview lasted a total of about 30 minutes. (Dkt. No. 46 at 9.) Morano suggested that the entire interview, from the officers' appearance to their final exit, took as long as an hour and a half. (*See* Dkt. No. 64 at 57.) Folster and Lombardi appear to have taken lead of the interview, with Lombardi asking most of the questions (Dkt. No. 64 at 13); Morano testified that he "was there as just part of the team as an observer. My department doesn't usually do those investigations. I was just there for the State Police as a courtesy." (Dkt. No. 64 at 12.)

The parties have conflicting testimony about how the conversation proceeded in Stroke's apartment. According to Stroke, the officers asked whether he had made any online postings during the past weekend, without specific reference to the content or the nature of the postings. Stroke answered yes. (Dkt. No. 46 at 13.) The officers then asked no other questions but read out loud some of the online posts contained in the NCMEC reports. Stroke did not recognize any of the posts. (*See* Dkt. No. 46 at 13–14.) Stroke did not testify about being asked to identify any email addresses that he used for the online postings. On cross-examination, however, Stroke admitted at the hearing that he owned the AOL address <thirteenrez@aol.com> along with other addresses. (Dkt. No. 46 at 34.) Stroke raised some doubt about whether he maintained exclusive control of the AOL email address, claiming that he had a problem with potential breach of the account around 2010. (*Id.* at 35–36.)

The officers had a different recollection of how the conversation unfolded. Lombardi recalled that Folster asked Stroke simply about "his online activities," and that Stroke "spontaneously said that he wouldn't do it anymore, that he would stop." (Dkt. No. 63 at 15.) According to Folster, he started by asking Stroke generally about "some online posts that he had made, and he immediately responded that he wasn't going to do it anymore and that he would stop." (Dkt. No. 42 at 26.) Morano recalled Lombardi as the questioner who prompted Stroke, testifying that "I am certain it was Investigator Lombardi who posed that—who said that to Mr. Stroke when we were in his apartment, and Mr. Stroke immediately said, 'I won't do it anymore.'" (Dkt. No. 64 at 12.) Lombardi then linked the AOL email address to the postings in the NCMEC reports; Lombardi "asked him [Stroke] what e-mail addresses he was using to make these posts and

he admitted to using the thirteenrez@aol.com, in addition to a couple others." (Dkt. No. 42 at 26.) Stroke denied actual intent to meet a child, downplaying the posts as "just being stupid" (Dkt. No. 42 at 27) or just saying that he didn't know why he made them. (*See also* Dkt. No. 35-8 at 2; Dkt. No. 63 at 21 ("Q. What did he [Stroke] specifically say in response to why he made these posts? A. I believe he said he didn't know why he responded—or made those posts, and I believe at one point he—he said that he just wanted to meet women with children.").) Stroke promised that he would stop, though when asked "when was the last time that he made postings sexually soliciting children" (Dkt. No. 42 at 92) he allegedly admitted to having made those kinds of online posts as recently as the previous weekend. The officers became concerned that Stroke "was still actively seeking underage children to engage in sex with." (Dkt. No. 42 at 29.) Morano testified specifically that he had a public safety concern "that he [Stroke] may have or was about to have perhaps young girls to the house; he had convinced somebody to have a young girl [] come to the house." (Dkt. No. 64 at 16.) The officers then asked Stroke what devices he used to make his online postings. Stroke allegedly told the officers that the only device he used was the Toshiba laptop computer sitting on the coffee table in front of them. (Gov't Hg. Ex. 9A.) The laptop was not password-protected. (Dkt. No. 63 at 18.) No one else had access to Stroke's apartment or to the laptop. (Dkt. No. 42 at 28; Dkt. No. 64 at 15.)

The house visit took a different turn when the officers asked Stroke whether they could "just take a quick look" at or otherwise browse the contents stored on the laptop. The officers started focusing on the laptop once Stroke admitted that any online postings would have been made solely from that device. (*See* Dkt. No. 63 at 17 ("Q. Okay. And once—once then the

defendant said that he used that specific laptop to make the posts, did you focus in at all on that specific computer?  A.  Yes, I did.").)  When Folster asked Stroke for a look at his laptop, he already believed that it contained evidence of a crime—"[a]t the very least attempting to disseminate indecent material to a minor."  (Dkt. No. 42 at 34–35.)  Lombardi had the same opinion.  "Based on my training and experience I felt it was very likely that there would be information on that computer that would identify criminal conduct, and also possibly any victims or possible victims that may be in danger from someone who generally posts for the purpose of meeting with and/or conversing with children in a sexual nature."  (Dkt. No. 63 at 21–22.)  Stroke denied the officers permission and allegedly "appeared concerned and worried that he was in a lot of trouble."  (Dkt. No. 42 at 33.)  At this point, the hearing testimony does not quite line up as to what happened next.  Most of the witnesses seem to be in agreement that two of the three officers stepped out of the apartment to confer while one remained in the apartment.  Stroke testified that Folster and Lombardi stepped out.  (Dkt. No. 46 at 15.)  Lombardi corroborated Stroke's recollection when he testified that he and Folster stopped the conversation to confer about what to do in the absence of a consent search.  "Investigator Folster and I did discuss how to proceed at that point and what we were going to do there at the scene . . . .  The discussion—the discussion was [] how would we proceed and we cannot leave this evidence here at this point, this property here at this point for fear that it was going to be destroyed.  At that point we decided that the best course of action would be to seize the computer equipment there at the scene."  (Dkt. No. 63 at 23; *see also id.* at 29 ("Because of the size of the apartment and issues with Mr. Stroke overhearing us, we stepped outside the apartment to have that conversation.").)  Morano, however, testified that "Investigator

13

Lombardi asked if I would join him in the hallway and we went out in the hallway and he asked me what I was thinking as far as the computer and asking Mr. Stroke if we could look at the computer." (Dkt. No. 64 at 17; *see also id.* at 57 ("Q. Now, how long were you into the hour and a half process before you and Lombardi went out in the hall? A. At most I would say 25 minutes.") Folster made no reference at all to any meeting in the hallway and testified as if he alone seized the laptop without consultation. (*See* Dkt. No. 42 at 35–36 ("I decided that the best course of action would be to seize the computer, to safeguard it from any evidence being destroyed or tampered with, so to take the evidence and go and obtain a search warrant.").) The Court credits Stroke and Lombardi's recollections; they seemed more confident about this detail at the hearing, and their recollections make more sense. If Folster and Lombardi took the lead in the interview that they likely would have wanted to consult about the next step before taking any action. While Folster and Lombardi conferred in the hallway, Morano stayed at the apartment's threshold; while there, he opened a closet near the entrance, without permission, and asked Stroke why he had a shovel in there. (Dkt. No. 46 at 58.) Folster and Lombardi returned about five minutes later with a utility vest, a bag, and a digital camera. (Dkt. No. 46 at 16.) The officers tried one more time to obtain a voluntary search of the laptop, even if just for an hour. Lombardi explained that the officers pressed again for a voluntary search of the laptop "because of the nature of the evidence here and the fact that Mr. Stroke admitted to making posts, to making posts using that computer, based on my training and experience in investigations of this nature and the types of posts that Mr. Stroke admitted to making are designed to meet and interact with children in a sexual nature and I believed that information would be contained on the computer." (Dkt. No. 63 at 22.) Stroke

advised the officers they would have to get a search warrant for the laptop if they wanted to browse it. At that point, Folster seized the laptop and some external storage devices without a warrant or an announcement of any rights. "I felt at that time it was the best course of action, to safeguard the—to safeguard the evidence that was there. I felt that if we had left the evidence there, there was no doubt in my mind that the evidence would have disappeared or at the very least been overwritten, wiped or destroyed." (Dkt. No. 42 at 36.) Folster knew that the New York Criminal Procedure Law ("CPL") allowed for an oral application of a search warrant; in 24 years with law enforcement, however, Folster never made an oral application for a search warrant. Folster considered an oral search warrant application to be a difficult procedure because of the requirement to take notes or to record the application. (*See id.* at 74–75; *see also* Dkt. No. 43 at 34 ("Again, I have never applied for an oral search warrant. I have never heard of anybody that I know of that I work with ever applying for an oral search warrant . . . . I knew that if I did apply for an oral search warrant application, at the very least it was going to be multiple hours before I could complete a search warrant—write down something that I could explain to the judge for this case because there was multiple aspects involving multiple posts on multiple different days and times.").) Folster tied his decision to his prior experiences. "I had no doubt that evidence would be stored on those devices in some manner. People tend to place backup data—flash drives can be used actually as an operating system to the computer. So the computer he was using, in order for it to run, he could have plugged the flash drive in, booted the operating system from the flash drive using his laptop and then committed the crime and all of the evidence would be stored on that flash drive." (Dkt. No. 43 at 50; *see also* Dkt. No. 63 at 26 ("[I]t's general knowledge that computer

peripherals in the location of the computer are readily accessed and used by someone using that computer.").) The laptop and storage devices went into State Police custody in Batavia. Although they felt the need to seize the laptop and storage devices without a warrant, the officers did not search the devices until they obtained a search warrant. Also, even though Stroke "admitted to committing the crime" (Dkt. No. 42 at 96), the officers did not obtain an arrest warrant. "Usually we want to have everything, all the evidence together before we go and make an arrest. It's very rare, unless we know absolutely for certain that the person is abusing a child there in the house that we actually make an arrest because we want to have everything together before we go and do that." (*Id.* at 99.) Folster never considered Stroke to be in custody. (Dkt. No. 43 at 56.) Folster, however, allegedly told Stroke that "whatever happens has to happen tonight. So you can either allow us to search your laptop now or you can come to the station with us now." (Dkt. No. 46 at 69; *see also id.* at 23 ("And Folster said, 'you can either come down with us to the police station now and talk while we look at your laptop or we can look at it now.'"). ) Stroke testified that an officer held out an arm to prevent him from taking any steps forward during the seizure of the laptop. (*See* Dkt. No. 46 at 11.) Morano denied that any officer made any physical contact with Stroke (Dkt. No. 64 at 24), but the Court finds that Morano indirectly corroborated Stroke's testimony in part. Morano testified that Stroke's demeanor was very nervous and that "[h]is arms are crossed, he's biting on his hand and just focused on looking at especially that laptop and the other items that were collected that were about the apartment on the floor." (Dkt. No. 64 at 21.) Folster attempted to testify that Stroke "realized that he had been caught and that he was in a lot of trouble." (Dkt. No. 42 at 32.) That comment drew an objection that the Court sustained, but the

16

attempt at that testimony and the preceding comment that Stroke "was a little shocked that we were there" made the impression at the hearing that Stroke had a motive to put himself between the officers and the laptop, and that the officers had a motive to prevent that from happening.

Folster and the other officers did not arrest Stroke on January 25, 2011 because they did not believe that they had probable cause to do so as of that evening. (Dkt. No. 43 at 32; Dkt. No. 64 at 52.) Folster did feel stronger, though, in his belief that Stroke committed the crime under investigation. "After speaking to Mr. Stroke and him admitting to making these postings using the e-mail address thirteenrez@aol.com, finding evidence there that he said that he—the laptop there that he said he just had made postings on and made all these postings on, I was confident at that point in time that he had committed a crime. However, as I explained earlier, typically we don't make an arrest that evening. We usually try to have everything—have a forensic examination done first and continue the investigation further." (Dkt. No. 43 at 33.)

E.    *The State Search Warrant*

On January 28, 2011, around 4:00 PM, Folster and Morano went to West Seneca Town Court Justice Dale McCabe. Folster presented Justice McCabe with an application for a search warrant to search the laptop and storage devices taken from Stroke three days earlier. Folster drafted the application and focused on probable cause to believe that the laptop and storage devices contained evidence of disseminating indecent material to minors in the second degree, in violation of New York Penal Law § 235.21(3). The application made no reference to any other statute. In support of the application, Folster cited to the NCMEC reports, including alleged messages posted online that were quoted in the reports. "To me if someone says they want to

talk—learn how to masturbate or assist someone with learning how to masturbate, to me that sounds like sexual content to me [for purposes of the statute]." (Dkt. No. 43 at 14.)  Folster also cited to the statements that Stroke allegedly made admitting to the postings, admitting to making postings as recently as the prior weekend, and admitting to using the laptop to make the postings. (*See* Gov't Hg. Ex. 6A.)  Justice McCabe issued the warrant at 4:15 PM that day.  The search warrant authorized an examination of the devices for data, programs, identifying log notes, or other documents relating to or used for "disseminating indecent material to minors in the second degree, in violation of New York State Penal Law Section 235.21(3), or attempted disseminating indecent material to minors in the second degree." (Gov't Hg.  Ex. 6B at 2.)

F.     *Results of the Search Warrant*

On February 4, 2011, Folster began his search of electronic content on Stroke's laptop. Folster started with a review of the laptop's "file structure" to observe file names.  "I was looking for specific things.  In the first—after obtaining the first search warrant, I was looking for those files that were indicative of disseminating indecent material to a minor and/or files that showed that Mr. Stroke had the intention to meet a child." (Dkt. No. 43 at 9.)  Folster noticed "a file that had some keywords in it that were indicative of child pornography." (Dkt. No. 42 at 52.)  Folster believed that the search warrant authorized him to view the video because

what I was looking for was any evidence, any computer data in regards to or related to disseminating indecent material to a minor or attempting to disseminate indecent material to a minor.

So that could include videos because these people that commit these types of crimes, from my training and experience, will video record the screen as they're chatting with minors, they may record chat rooms when they're in there, the conversations that they have.  They obtain some type of gratification from doing so.

(*Id.* at 52–53.) Upon viewing the video, Folster "discovered that the video contained a video of child pornography or sexual abuse of a child." (*Id.* at 56.) Folster realized that the search warrant did not cover child pornography *per se*, but the exact chronology of what happened next is not clear. Folster continued at least some of his forensic examination of the laptop under the existing warrant. Folster testified that "I continued to look for some of that data [*i.e.*, regarding disseminating indecent material to a minor]. I believe I found some chat logs that I exported out, but at the end of the day I end up stopping the examination and applied for a search warrant for what I discovered was child pornography." (*Id.* at 57; *but see id.* at 56 ("I then completed doing my forensic examination and applied for an amended search warrant to include child pornography.").) The application for the federal search warrant described Folster as having terminated his search after discovering one video file, of seven minutes and 38 seconds in length, that unambiguously depicted child pornography. (Dkt. No. 35-12 at 6–7.) Eventually, on February 8, 2011, Folster applied for and received an amended search warrant. The amended search warrant, again from Justice McCabe, was substantially similar to the original search warrant in all respects except to add, as an additional basis for probable cause, the first video that Folster found on the laptop and the potential charge of possession of a sexual performance by a child in violation of New York Penal Law § 263.16. (*See* Gov't Hg. Exs. 7A, 7B.) Justice McCabe reviewed the amended search warrant application for approximately 20–30 minutes. (*See* Dkt. No. 43 at 19.) Resuming the search of the laptop and devices after the amended search warrant, Folster allegedly found evidence of possession of a sexual performance of a child. (Dkt. No. 42 at 62; Dkt. No. 43 at 30).

Around March 17, 2011, Folster contacted agents at the Federal Bureau of Investigation ("FBI") about transferring the investigation to a federal agency. On May 3, 2011, Folster transferred Stroke's laptop and devices to the FBI. Stroke never was charged with any violation of state law. Folster did not notify Justice McCabe of the transfer of property to the FBI. (Dkt. No. 74 at 24–25.) Folster also did not, under New York Criminal Procedure Law § 650(5), provide Justice McCabe with any inventory of materials found in Stroke's laptop and storage devices. Folster explained his reasoning this way:

> To me it's—when they thought about creating this statute for search warrants, they were thinking about us going out to somebody's house and seizing property and the judge wouldn't know what property was seized. In this situation with computers now, things have changed since the laws were written and, obviously, if I give the judge an application for a search warrant telling him this is the property that we have in our custody, he's aware of what property that we have . . . . [A]t what point in time is property that I see on someone's computer something that I should report back to him? Every single time I look at a file, is that something that is now in my custody and I should have to report back to him? I'm not sure where you draw the line between when the judge should be notified of what property is something that I need to report back.

(*Id.* at 23.)

The FBI took over the investigation and the file but did not take any significant further action for about two years. On August 29, 2013, federal agents obtained their own search warrants from Magistrate Judge H. Kenneth Schroeder, Jr. for the contents of the laptop and other seized devices. (*See* Dkt. No. 35-12; *see also generally* Case No. 13-MJ-127.) "In total, child pornography was found on five of the seven electronic items seized from the defendant's residence." (Dkt. No. 36 at 7.)

G.    *Witness Credibility*

At any factual hearing, the Court needs to assess the credibility of the witnesses who testified.  "The obligations of the court as the trier of fact are to determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has persuaded it as factfinder that the requisite facts are proven."  *Cifra v. G.E. Co.*, 252 F.3d 205, 215 (2d Cir. 2001).  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited.  An adverse credibility determination is appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony."  *United States v. Lawson*, 961 F. Supp. 2d 496, 504 (W.D.N.Y. 2013) (internal quotation marks and citations omitted).  "The court is also entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted).  "[A] witness's demeanor on the stand, including his or her confidence, impacts the assessment of credibility."  *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).

Here, the Court finds that all of the witnesses were generally credible except where self-serving evasiveness became obvious.  Stroke's evasiveness concerned his failure to recognize the postings contained in the NCMEC reports and his description of whatever online activity he conducted the weekend before the interview.  Without infringing on the presumption of innocence at trial, Stroke admitted to owning the AOL email address described in the NCMEC reports; he admitted to engaging in some kind of online activity just a few days before the interview; and to date, he has not produced any documentation of any interactions with AOL

customer service representatives about a possible breach of his account.[3]  In this context, and regardless of whether he explicitly made certain admissions to the officers, his inability to recognize the statements in the NCMEC reports was not credible.  Stroke also was not credible to the extent that he tried to avoid any details of the "online postings" to which he admitted.  If Stroke had made online postings the weekend before the interview about sports, gardening, or his favorite recipes then surely he would have said so.  Stroke was not credible to the extent that he tried to claim that he could not remember where he made any unspecified postings just a few days earlier.  (*See, e.g.,* Dkt. No. 46 at 53 ("I believe after he [Lombardi] asked me if I made any online postings.  I said, 'yes.'  And Lombardi had asked me on what websites.  I told him I didn't remember.").

Meanwhile, the Court found the officers to be evasive about how much pressure they applied to Stroke in an attempt to obtain admissions and evidence.  The officers testified that they wanted more information for their investigation, including enough information that would justify a search warrant if the need for one arose.  The officers repeatedly pressed Stroke to admit to the entirety of the contents of the NCMEC reports.  Even Stroke agrees that he made some admissions—enough to set up the legal analysis that follows below—but the suggestion at the hearing that Stroke opened up immediately with spontaneous, detailed admissions was not credible.  What began as a voluntary interview effectively ended (*see infra*) as a Fourth Amendment seizure.  Once the officers had admissions from Stroke that he owned the AOL email account in question and that his laptop was the sole computer used for any online postings, they had probable

---

[3] Stroke, to be clear, bears no burden here once he established a factual basis for his motion.  The Court notes the unsubstantiated allegation of an account breach for the limited purpose of assessing credibility of testimony.

cause to believe that the laptop contained evidence that would confirm all of the contents of the NCMEC reports.  There was no way that the officers would leave Stroke's apartment without the laptop that evening.  (*See* Dkt. No. 42 at 36 ("I felt that if we had left the evidence there, there was no doubt in my mind that the evidence would have disappeared or at the very least been overwritten, wiped or destroyed.").)  Under those circumstances, while the officers certainly did not place Stroke in handcuffs or apply any meaningful force against him, the Court credits Stroke's testimony that they made a show of authority and prevented him from coming near the laptop anymore.

H.     *This Case*

This case began with a pre-indictment complaint that the Government filed on January 30, 2014.  (Dkt. No. 1.)  In the complaint, the Government recited the online postings from the NCMEC reports and summarized both the knock and talk interview and the results of the two search warrants that Folster obtained.  The Government recited further that it obtained a federal search warrant on August 29, 2013 for the contents of the laptop; the Government summarized three videos that it found on the laptop that it believed constituted child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  Federal agents arrested Stroke on January 31, 2014, and the Court held an initial appearance that day.  (Dkt. No. 3.)  Following a detention hearing, the Court released Stroke on conditions on February 3, 2014.  (Dkt. No. 5.)

The Government filed an indictment against Stroke on March 4, 2014.  (Dkt. No. 11.) The indictment contains five counts and a forfeiture notice.  The five counts essentially are identical accusations of possession of child pornography in violation of 18 U.S.C.

§ 2252A(a)(5)(B); each count corresponds to one of the electronic devices that Folster and the other officers had seized. The forfeiture notice relates to all of the electronic devices. The Court arraigned Stroke on March 10, 2014. (Dkt. No. 15.)

I.    *Pending Motions*

On August 4, 2014, Stroke filed omnibus pretrial motions. (Dkt. No. 35.) The motions included non-dispositive motions for discovery and various forms of relief. The motions also included a dispositive motion to suppress any evidence obtained as a result of the Albany County grand jury subpoenas, the knock and talk interview, the state search warrants, and the federal search warrant. (*Id.* at 19–21.) The Court has addressed the non-dispositive motions through a separate Decision and Order released with this Report and Recommendation. This Report and Recommendation will focus on the suppression motion; given the extensive time and effort the parties devoted to the suppression motion, that motion deserves singular analysis and attention.

Stroke advances several arguments in favor of suppression. Stroke argues that the Albany County grand jury subpoenas were illegal and thus improperly helped spur the knock and talk interview. Stroke argues that exigent circumstances did not justify the warrantless seizure of his laptop and related electronic devices. Stroke argues further that the two West Seneca search warrants were improperly issued for numerous reasons, including the reliance on previous information obtained improperly; the failure to file an inventory as required by CPL § 690.50(6); and language that authorized an excessively broad search. Stroke challenges the federal search warrant as defective for several reasons, including its reliance on improperly obtain information;

the improper transfer of the seized property from state to federal jurisdiction; and the length of time that passed between the transfer 2011 and the application for the search warrant 2013.

The Government opposes the motion for suppression in its entirety. The Government argues that the officers had exigent circumstances to seize the laptop and other devices because they established probable cause to believe that the devices contained evidence of the state charge under consideration at the time and they reasonably believed that the evidence would be destroyed if they waited until the next day to obtain the items. The Government defends all of the search warrants in this case as containing detailed descriptions of the property to be searched and thus not overbroad. The Government argues further that each judge associated with the search warrants had accurate information establishing probable cause, that any missing information about possible state procedural violations did not affect probable cause, and that the officers and agents relied on the search warrants in good faith.

J.      *Section 235.21(3) and Judge Preska's Injunction*

While all of the above events were occurring, another issue was flowing beneath the surface—an issue that, unfortunately, the Court did not detect until it bubbled to the surface last year. The issue touches on the reach of federal court injunctions and the constitutionality of the statute, N.Y. Penal Law § 235.21(3), that formed the exclusive basis for Folster's first search warrant.

Understanding the issue at question requires going all the way back to 1996 in Albany and 1997 in the United States District Court for the Southern District of New York. The New York State legislature amended Section 235.21 to add a new subdivision three—the Section 235.21(3) at

issue here—in late 1996. Dissemination of Indecent Material to Minors Through Any Computer Communication System, 1996 Sess. Law News of N.Y. Ch. 600 (S. 210–E) (McKinney Nov. 1, 1996) (available in Westlaw). On January 14, 1997, the American Library Association and several other plaintiffs filed suit against the New York State Attorney General (in an official capacity), in the Southern District of New York. The plaintiffs sought to enjoin enforcement of Section 235.21(3) on the grounds that the statute was vague and excessively broad and would ensnare both harmless communications and interstate communications, violating both the First Amendment and the Commerce Clause. On June 20, 1997, District Judge Loretta Preska agreed that Section 235.21(3) violated the Commerce Clause and issued a preliminary injunction against enforcement. *See Am. Library Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997). For purposes of the criminal case here, this Court is not terribly concerned with why Judge Preska found fault with Section 235.21(3) in a civil case brought by librarians and magazine publishers. There are, however, two aspects to *American Library* that matter here. First, Judge Preska decided that her injunction "would effectively bar enforcement of the Act whether the prosecution happened to be brought directly by the Attorney General's office or by one of the individual District Attorneys." 969 F. Supp. at 163. The case ended on September 2, 1997 with a permanent injunction that read as follows:

> 1. Defendant Governor George Pataki and Defendant Attorney General Dennis Vacco, and pursuant to Fed. R. Civ. P. 65(d), defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with defendants who receive actual notice of this order are PERMANENTLY ENJOINED from enforcing New York Penal Law § 235.21(3)and from prosecuting, investigating or reviewing any matter under the authority of that section; and

2.     Defendants shall, within five days of entry of the Order, notify the sixty-two
District Attorneys of the State of New York of the contents of this Order.

(S.D.N.Y. Case No. 97-CV-222, Dkt. No. 34 (attached as an Appendix).)  Second, the State of New

York never appealed the preliminary or the permanent injunction.  Judge Preska's permanent

injunction, therefore, remains in effect.  In fact, the Court is aware of at least one instance when a

conviction under Section 235.21(3) was vacated because of the permanent injunction.  *See generally*

*People v. Burgess*, 863 N.Y.S.2d 376 (N.Y. App. Div. 2008).[4]

The permanent injunction in *American Library* came to the forefront of this case last year,

while the Court was reviewing the papers and the testimony from Stroke's suppression hearing.

Amidst all of the other arguments that the parties raised in the case, Stroke included an argument

that the permanent injunction in *American Library* required suppression here because, put bluntly,

Folster had no business investigating anybody in 2011 under a statute that had been enjoined and

declared unconstitutional 14 years earlier.  (Dkt. No. 89 at 7–11.)  The Government had not

responded specifically to this argument in its initial papers, but the Court decided that the

argument needed more attention.  The permanent injunction appeared to be in effect; *Burgess*

suggested that the state understood the scope of the permanent injunction; and yet the New York

legislature introduced a bill last year that would make only minor changes to Section 235.21(3) and

would not acknowledge any concerns about constitutionality.  *See* 2017 N.Y. Assembly Bill No.

7056 (Mar. 29, 2017).  Out of concern that the constitutionality of Section 235.21(3) would have

---

[4] The defendant in *Burgess* was convicted at the trial level, only to have the conviction vacated on the prosecutor's request at the appellate level.  The Court infers from the sequence of events that the Queens County District Attorney did not know about the injunction at the time of trial.

to be discussed to resolve this case, the Court invoked 28 U.S.C. § 2403(b) and invited the New York Attorney General to intervene.  (Dkt. No. 151.)  The Attorney General filed a notice of appearance on August 4, 2017 (Dkt. No. 153) but then moved to withdraw on December 11, 2017 without ever filing any substantive papers.  (Dkt. No. 165.)  As far as the Court is concerned, the reason for the withdrawal says all that needs to be said about whether the permanent injunction remains in effect: "Upon further reflection and consultation within OAG, the Office has concluded that there is a substantial risk of its violating Judge Preska's injunction by making an appearance to support a prosecution that indirectly relies on Penal Law § 235.21(3), and we decline to take that risk."  (*Id.* at 3.)

At Stroke's request and to continue its caution about the possible impact of the permanent injunction, the Court reopened the suppression hearing to supplement the record to help address how Folster's investigation occurred in the face of the injunction.  The supplemental proceedings have not been transcribed as of this writing, but the Court provides the following highlights from the archived digital audio recordings.  On February 7, 2018, Folster testified that State Police division counsel had a website that they would use to post "a handful" of legal updates throughout the year.  Prior to the use of the website, including the late 1990s, legal updates would have been disseminated by teletype and posted physically on bulletin boards at the various State Police offices or barracks.  Folster was not able to go as far back as 1997, but he did check about 11 years' worth of prior updates that he received and found no updates concerning *American Library*.  Nonetheless, according to Folster and based on his practices, there was no way in which an update would have issued and he would have missed it.  Consequently, Folster had not heard of *American Library* until

this case and had, in his view, every reason to believe that Section 235.21(3) was a proper statute to enforce. On May 8, 2018, Assistant Erie County District Attorney Donna Milling testified. Milling testified that she had not heard of *American Library* or the permanent injunction until she received a subpoena from defense counsel in this case to testify. Milling's position on the permanent injunction was as follows: "If somebody came to my office today and said I'd like to charge the defendant, I'd like to charge somebody with this crime, I would look at the Penal Law—it's still on the books, and I would say nothing prevents you from charging it. I would point out that there is a Southern District court case out there, but—the Court of Appeals[5] has not said that the statute is unconstitutional." Upon further questioning, Milling did not realize that the permanent injunction had not been appealed. Milling testified further that prosecutions under Section 235.21(3) have occurred in Erie County since 1997 but that she did not know how many at that time. In follow-up testimony on July 12, 2018, Milling testified that she diligently arranged for a records search at her office and found that, from 2005 through May 9, 2018, 25 individuals had been charged with violations of Section 235.21(3) and 11 had been convicted. (Gov't Ex. 18.) Michael Russo also testified on July 12, 2018. Russo is an Assistant Attorney General and the person in charge of the Buffalo regional office. On objection from Assistant Attorney General Christopher Boyd, who was representing Russo for purposes of the proceeding, Russo declined to comment in any way on the validity or invalidity of the permanent injunction. Boyd noted that legal opinions come from the Attorney General's office in Albany. Russo did testify that he had not heard of *American Library* until the Attorney General's Office received a subpoena from

---

[5] Because she was referring to Judge Preska's case and not the statute itself, Milling probably meant the Second Circuit and not the New York Court of Appeals.

defense counsel in this case. Upon learning of the subpoena, Russo diligently tried to search for any documents or files concerning the original *American Library* case, the permanent injunction, or the dissemination of the permanent injunction as was required by Judge Preska. Per standard document policy, the original case file had been destroyed in 2009 after 10 years in the state archives. The state archives contained no other information about whether the District Attorneys statewide had been notified. Russo also was unable to find any information indicating, one way or the other, whether prior Attorneys General or the current Attorney General knew of the permanent injunction or took actions related to it. The closest that Russo could come to any information about the permanent injunction is something speculative to which the Court will assign little weight but will include here for the completeness of the record. Russo testified that he was able to contact an Assistant Attorney General—possibly now retired, the testimony was not clear—who handled the original case back in 1997. That attorney had a vague recollection of an instance from around 1997 when secretaries in his office complained about having to locate 62 addresses for 62 District Attorneys. That instance may or may not have been connected to Judge Preska's direction to disseminate the permanent injunction.

III.    DISCUSSION

A.    *Burden of Proof*

"In a motion to suppress physical evidence, the burden of proof is initially on the defendant. Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005) (citations omitted); *see also United States v. Carollo*, No. 09 CR.

1058 VM, 2011 WL 6935292, at *2 (S.D.N.Y. Dec. 30, 2011) (citations omitted). "The

government has the ultimate burden of persuasion." *United States v. Magaddino*, 496 F.2d 455, 460

(2d Cir. 1974) (citation omitted). "The standard of proof on the party who carries the burden is

preponderance of the evidence." *United States v. Allen*, 289 F. Supp. 2d 230, 242 (N.D.N.Y. 2003)

(citation omitted); *accord United States v. Martinez*, 992 F. Supp. 2d 322, 332 (S.D.N.Y. 2014) ("On

a motion to suppress, the government bears the burden of proving the propriety of law

enforcement conduct by a preponderance of the evidence.") (citation omitted).

B.    *Impact of Judge Preska's Injunction*

The first issue that the Court needs to address is the impact, if any, on this case from the

permanent injunction in *American Library*. Stroke has put heavy emphasis on this issue, and for

good reason: Folster has testified that he investigated the NCMEC reports for possible violations of

Section 235.21(3), and the first search warrant—the warrant that set off a cascade of other

events—listed only Section 235.21(3) as the basis for probable cause. Every piece of evidence that

became available after January 25, 2011 potentially would be in jeopardy of suppression if Folster

had no justification for obtaining the first search warrant from West Seneca Town Court. As part

of his argument that Folster cannot justify the application for the search warrant, Stroke notes how

different this case is from many Fourth Amendment cases in which a search warrant or a statute

was declared invalid after law enforcement agents acted:

> Our case is different. The statute was declared unconstitutional long before
> the search warrant, not after. Clearly an officer cannot claim a reasonable mistake
> of law if he or she knows what the law is. This raises the greater question of whose
> responsibility it is to inform police of changes in the law. It seems clear that police
> must be [kept] abreast of changes in the law. It cannot seriously be expected that
> police only know what the law is as of the time of their training and hiring; laws are

revised and amended, new laws are added, and some laws are declared unconstitutional. How do the police find out about these changes?

* * *

In any case, there are only two plausible reasons for why the Attorney General's office did not warn enforce the decision, which was later published: either they knew about the decision and did not tell anyone because they did not want to give the decision any effect, or they failed to learn about the decision, despite a general duty to know what the law is, and despite the fact that their institutional client was a party to the case. In sum, it was either intentional disregard of the decision, or negligent ignorance of it. Either option calls for the same remedy: suppression.

(Dkt. No. 199 at 5–6.) Stroke continues his theme of institutional problems by emphasizing that

Folster's enforcement of a statute enjoined 14 years earlier could have happened only as a result of

institutional failure that will continue unabated without the deterrent of suppression:

It is possible that no one person is truly responsible for the oversight that led to Mr. Stroke's investigation under a law which had been rendered invalid almost 20 years before. But the oversight still caused a violation of Mr. Stroke's Fourth Amendment rights. The Erie County Assistant District Attorney's office conceded in their testimony that others have been prosecuted under P.L. § 235.21 since 1997. Also, the Attorney General's and Erie County District Attorney's Offices have been put on-notice by this case that the *American Libraries* decision is still valid. Yet by all appearances, they have taken no steps to advise law enforcement of the case or the injunction against P.L. § 235.21. Whatever "innocent ignorance" of the law the government enjoyed before these hearings is now gone. These agencies continue to flaunt the decision and injunction, showing mere disregard for the law.

(*Id.* at 6–7.)

The Government attacks Stroke's argument on two levels. On one level, the Government

emphasizes that Folster acted in good faith and that the evidence that he obtained qualifies for the

good-faith exception described in *United States v. Leon*, 468 U.S. 897 (1984). Folster did not know

about the permanent injunction; he presented a neutral and detached judge with the best

information available to him—information that, apart from the ignorance of the permanent

injunction, was factually complete and accurate. Justice McCabe, who apparently was ignorant of the permanent injunction as well, went ahead and issued the search warrant, giving Folster no reason to second-guess him. "Moreover, suppression of evidence is not automatically warranted where evidence is seized pursuant to a warrant that is void *ab initio*, such as in recent cases involving Network Investigative Technique ('NIT') warrants." (Dkt. No. 200 at 7.) On another level, the Government attacks Stroke's argument "because it ignores the applicability of the good faith doctrine set forth above and would improperly assume that the decision in *Pataki* [*i.e., American Library*] is binding precedent on the issue of the constitutionality of NY Penal Law § 235.21(3)." (*Id.* at 8.) This latter argument appears to set aside the permanent injunction itself to focus on the opinion that led to its issuance.

Stroke is correct to note that the Supreme Court has at least contemplated the possibility of systemic or institutional failure that would have to be deterred through suppression. The Supreme Court in *Leon* itself implied that suppression could target institutions and not just individuals, so long as a specific policy had been targeted that would change through suppression. *See Leon*, 468 U.S. at 918 ("If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments."). This sentiment is consistent with an earlier ruling that, in effect, federal law enforcement agents cannot use state law enforcement agents to violate the Fourth Amendment for them. "The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard

33

it." *Elkins v. United States*, 364 U.S. 206, 217 (1960) (citation omitted); *see also James P. Fleissner, Glide Path to an "Inclusionary Rule": How Expansion of the Good Faith Exception Threatens to Fundamentally Change the Exclusionary Rule*, 48 Mercer L. Rev. 1023, 1043 (1997) ("The evidence supporting the beneficial effects of the Exclusionary Rule can be contrasted with the dismal record and prospects of the alternatives. Professor Kamisar put it this way: 'The overwhelming consensus is that civil suits, criminal prosecution, *injunctions*, review boards, and internal police discipline are sadly inadequate.'") (emphasis added) (citations omitted).

With respect to the prospect of injunctive relief against institutions, the Supreme Court was perhaps too optimistic about situations like Stroke's when it asserted that anyone subject to an overreaching or otherwise improper statute "may bring an action seeking a declaration that the statute is unconstitutional and an injunction barring its implementation." *Illinois v. Krull*, 480 U.S. 340, 354 (1987). An injunction to block an invalid statute is exactly the remedy that occurred here and that would fall short if the Government's view prevails. The Government's attacks on Judge Preska's opinion in *American Library* notwithstanding, why Judge Preska issued her permanent injunction is largely if not wholly irrelevant. The permanent injunction happened. The injunction bars any enforcement of Section 235.21(3) by the Attorney General, all 62 District Attorneys in New York state, and "officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with defendants who receive actual notice of this order." The injunction remains in effect, and the Attorney General has respected it to the point that it will not even comment on the injunction in this case. There is at least a colorable argument that, regardless of any standing statutory relationship, the State Police were in "active concert or

participation" with the Attorney General for this case by way of the grand jury subpoenas issued in Albany. Folster testified that he never would have visited Stroke's house on January 25, 2011 without first having confirmed Stroke's identity. That confirmation came through the grand jury subpoenas, which the Attorney General arguably never should have issued in furtherance of an investigation under a blocked statute. In fact, the number of events that occurred here that should not have occurred in the face of the permanent injunction is alarming. The Court is, quite frankly, disturbed at the level of negligence, to be charitable, or passive-aggressive defiance that has occurred and continues to occur. The Attorney General cannot confirm that it complied with Judge Preska's order to notify all 62 District Attorneys of the permanent injunction. The *Burgess* case mentioned earlier appears to be an example of prosecutions that have occurred in the absence of notice, the error being caught in that instance on appeal. Despite a regular practice of issuing bulletins about legal changes, the Attorney General appears never to have informed law enforcement about a major legal development for the 14 years before the knock and talk interview at Stroke's apartment and for the 21 years since the permanent injunction issued. The record confirms that people in the state, and probably across the state, have been convicted under a statute that was permanently enjoined and never defended through appeal or collateral attack on that injunction. Those convictions will continue, at least in Erie County, because the Erie County District Attorney's Office essentially has declared that a 21-year-old statewide injunction does not apply to it. The open and casual disregard for an enforceable federal injunction—not to put too fine a point on it—stinks.

This situation cannot stand. *Leon* found good faith where a search warrant was found

invalid after the search in question. *Krull* similarly found good faith for a warrantless search

authorized by a state statute found later to be unconstitutional. Warrants that are facially invalid

at the time of issuance have met with mixed results depending on the circumstances. *Compare, e.g.,*

*Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (constitutional violation and no qualified immunity for

a search warrant that lacked particularity on its face) *and Michigan v. DeFillippo*, 443 U.S. 31, 39

(1979) (no suppression where a local ordinance allegedly violated was later held unconstitutional)

*with United States v. Horton*, 863 F.3d 1041, 1052 (8th Cir. 2017) (officers acted in good faith on a

search warrant deemed to be void *ab initio*), *cert. denied*, 138 S. Ct. 1440 (2018). The spectrum of

Fourth Amendment cases starts sliding toward suppression when the foundation for

unconstitutional searches is facially apparent before any searches actually occur. *See City of Los*

*Angeles v. Patel*, ___ U.S. ___, 135 S. Ct. 2443, 2451 (2015) ("[W]e hold that [a statute making

hotel guest records available for warrantless review] is facially unconstitutional because it fails to

provide hotel operators with an opportunity for precompliance review."); *Ferguson v. City of*

*Charleston*, 532 U.S. 67, 84 (2001) (Fourth Amendment violation where a state hospital's drug

testing policy forwarded patients' drug tests to law enforcement without patient knowledge or

consent); *Torres v. Com. of Puerto Rico*, 442 U.S. 465, 474 (1979) (suppression required where a

Commonwealth statute authorized warrantless seizures). Stroke's case simply continues along that

spectrum. For 14 years before Folster's knock and talk interview, the State of New York was

prohibited from conducting any investigation or prosecution under Section 235.21(3). For 14

years, therefore, any institutional policy or practice that encouraged or condoned such

investigations or prosecutions effectively was a policy or practice that authorized warrantless searches. The Attorney General, whether intentionally or negligently, had that kind of policy or practice in place. The Attorney General failed to advise the District Attorneys of the permanent injunction, as Judge Preska required. The Attorney General, knowing that the State Police had an active role in enforcing Section 235.21(3), failed to advise the agency that investigations or prosecutions under the statute were prohibited. Going further, the Attorney General in this case facilitated a violation of Judge Preska's permanent injunction by issuing the Albany County grand jury subpoenas to help Folster with his investigation. And going even further, this case produced testimony from at least one prosecutorial office in the state to the effect that people have been convicted, and will continue to be convicted, despite a federal injunction that forbids such convictions. The pattern of conduct in this case has demonstrated that no remedy short of suppression will force either compliance with Judge Preska's permanent injunction or some kind of proceeding to revisit that injunction.

In recommending suppression, the Court should make a few things clear. The Court takes no position on whether the passage of 21 years requires a revisiting of Judge Preska's permanent injunction or how that revisiting should occur. The Court also will not speculate as to what should occur at the state level, if anything, to bring either law enforcement practice or Section 235.21(3) itself into compliance with the permanent injunction. The Court further will not hazard any guess as to whether this case would turn out differently if Judge Preska's permanent injunction had issued, for example, days or weeks before the knock and talk interview as opposed to 14 years before. The Court's only concern is limited: Respect for federal injunctive power

requires concluding that the first state search warrant issued here violated the Fourth Amendment, and that any transfer of the resulting evidence to federal law enforcement violated the *Elkins* doctrine.

For the above reasons, the Court recommends granting Stroke's motion to suppress. Because of the impact that suppression likely would have on the case, the Court will proceed below assessing Stroke's other arguments for suppression, as an alternative recommendation should Judge Skretny decide not to suppress for reasons related to the permanent injunction.

C. *Knock and Talk Interview on January 25, 2011*

The analysis of Stroke's suppression motion should proceed next with the knock and talk interview that occurred on January 25, 2011. The knock and talk interview marked the first event in this case that directly implicated the Fourth Amendment. If Folster lacked the appropriate basis for visiting Stroke in the first place, or if Folster strayed outside the boundaries of a knock and talk interview, then suppression likely would be required regardless of subsequent events.

"Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (citations omitted); *accord United States v. Larson*, 63 F. App'x 416, 426 (10th Cir. 2003) (unpublished decision). "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. When the police knock on a door but the occupants

choose not to respond or to speak, the investigation will have reached a conspicuously low point, and the occupants will have the kind of warning that even the most elaborate security system cannot provide. And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Kentucky v. King*, 563 U.S. 452, 469–70 (2011) (internal quotation marks and citations omitted). Some case law contains language suggesting that a knock and talk interview requires some minimum level of suspicion of criminal activity. *See United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants.") (citations omitted).[6] Nonetheless, so long as a knock and talk interview stays at the level of a consensual conversation and does not implicate "curtilage" privacy rights, the law enforcement agents involved do not require any level of suspicion. *See United States v. Johnson*, 170 F.3d 708, 720 (7th Cir. 1999) ("We do not hold today that the 'knock and talk' technique is automatically unconstitutional. Nevertheless . . . the police themselves must recognize the inherent limits in this more informal way of proceeding.").

The above principles give the Court guidance as to how to assess the knock and talk interview that Folster conducted. Folster and the other officers approached Stroke's building and stopped at an outer security entrance that provided common access for all residents of the building. The approach to the outer security entrance raised no concerns about entering curtilage

---

[6] Any ambiguity from *Tobin* probably can be resolved from context. The court in *Tobin* was comparing reasonable suspicion to probable cause and found that the law enforcement agents' reasonable suspicion was not enough for warrantless entry but more than enough—not the minimum required—for a knock and talk interview.

areas, and Stroke has not argued otherwise. Stroke himself walked to the door when the officers rang the doorbell. One of the officers did show a badge, and the officers were wearing lettered jackets, but their introduction overall did not constitute any show of force or authority. (*See* Dkt. No. 63 at 45 ("Sir, when you're knocking on a door in plain clothes you do want to make sure that the people you're speaking to can readily identify you as a law enforcement officer and that's the reason we wear a raid jacket.").) Stroke chose to open the door and to walk back to his apartment with the officers. The knock and talk interview thus began as a completely voluntary conversation. Folster and the other officers were looking for additional evidence against Stroke, but they already had some level of suspicion, close to probable cause if not quite there, that Stroke posted indecent messages online in an attempt to disseminate indecent material to minors. Until they saw the laptop, Folster and the other officers made no assertion of authority to change the tone of the conversation.

Once they saw the laptop and Stroke confirmed his use of it to post indecent messages, Folster and the other officers did change the tone of the conversation. When Folster knew that the laptop was the sole device used to post the messages, he knew that if any evidence still existed about those postings then it would be on that laptop. Folster felt that he had to secure the laptop to preserve what evidence remained. The Court credits the officers' testimony that, whatever the details, Stroke's demeanor changed as they pressed to obtain the laptop and Stroke resisted. The Court, in turn, credits Stroke's testimony that Folster, told him that "whatever happens has to happen tonight. So you can either allow us to search your laptop now or you can come to the station with us now." (Dkt. No. 46 at 69.) The Court credits Stroke's testimony further that one

of the officers held out an arm to prevent him from taking any steps forward during the seizure of the laptop. (*See* Dkt. No. 46 at 11.) Once Folster asserted that he had to take action that night, and once the officers used physical restraint, albeit mild, to keep Stroke away from the laptop, a Fourth Amendment seizure occurred. *Cf. United States v. Johnson*, 107 F. App'x 674, 677 (7th Cir. 2004) (unpublished decision) ("A seizure can occur when an officer by means of physical force or show of authority has in some way restrained the liberty of a citizen. Courts look at the totality of the circumstances to assess whether a seizure has occurred, and one circumstance that suggests a seizure is a display of a weapon by an officer. Another indication of a seizure is when an officer refuses to take no for an answer.") (internal quotation and editorial marks and citations omitted); *see also United States v. Allen*, 813 F.3d 76, 86 (2d Cir. 2016) ("By advising Allen that he was under arrest, and taking control of his further movements, the officers asserted their power over him *inside his home*. That they did so is evident if we consider what would have happened if Allen, after being told in effect that he was under arrest, had simply closed the door and retreated deeper into his home. It is inconceivable that the officers would at that point have shrugged their shoulders and turned away."). Folster had no warrant at this point, of course, but the Government has argued that exigent circumstances justified the actions that the officers took without a warrant. The Court will review the argument about exigent circumstances below.

     D.     *Warrantless Seizure of Laptop*

     Because the knock and talk interview began without any infirmities but quickly turned into a seizure, the Court next needs to review Folster's decision to seize Stroke's laptop without a warrant. "The Fourth Amendment prohibits unreasonable searches and seizures and provides that

a warrant may not be issued without probable cause, but the text of the Fourth Amendment does not specify when a search warrant must be obtained . . . . [A] warrant is generally required for a search of a home, but the ultimate touchstone of the Fourth Amendment is reasonableness. And certain categories of permissible warrantless searches have long been recognized." *Fernandez v. California*, ___ U.S. ___, 134 S. Ct. 1126, 1131 (2014) (internal quotation marks and citations omitted). "One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (internal quotation and editorial marks and citations omitted). "Exigent circumstances refer generally to those situations in which law enforcement officers will be unable or unlikely to effectuate an arrest, search or seizure for which probable cause exists, unless they act swiftly, even though they have not obtained prior judicial authorization." *United States v. Gallo-Roman*, 816 F.2d 76, 79 (2d Cir. 1987) (citation omitted). The test for determining whether warrantless law enforcement action had been justified by exigent circumstances "is an objective one that turns on the district court's examination of the totality of circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (citations omitted). Sometimes, the presence of solitary factors such as imminent destruction of evidence will suffice. *See Schmerber v. California*, 384 U.S. 757, 770 (1966) (citations omitted); *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (citations omitted); *MacDonald*, 916 F.2d at 770 (citations omitted); *Gallo-Roman*, 816 F.2d at 79.

Here, circumstances justified Folster's decision to seize Stroke's laptop. By the time he saw the laptop, Folster already had probable cause to believe that Stroke posted messages online in an attempt to disseminate indecent material to minors or to recruit minors for sexually inappropriate purposes. Folster conceded that he did not remember the exact language of every element of the statute in question, but Folster had a sufficient grasp of the overall statute and of the facts that eventually would support the individual elements. "A person is guilty of disseminating indecent material to minors in the second degree when . . . Knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, he intentionally uses any computer communication system allowing the input, output, examination or transfer, of computer data or computer programs from one computer to another, to initiate or engage in such communication with a person who is a minor." N.Y. Penal Law § 235.21(3). The word "depict" includes textual descriptions of sexually explicit communications. *See People v. Kozlow*, 870 N.E.2d 118, 122 (N.Y. 2007) (citations omitted). Additionally, "'Sexual conduct' means acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast." N.Y. Penal Law § 235.20(3). By the time Folster saw Stroke's laptop he had four NCMEC reports linking Stroke and his AOL email account to online postings such as the ones quoted above, plus others. Regardless of how much the parties disagree over how many of the postings Stroke explicitly admitted to writing, the testimony from the suppression hearing is consistent to the extent that Stroke had that email account, used it for at least some online postings, and wrote all his postings from the laptop. The

Government might need more at trial to establish guilt beyond a reasonable doubt, but Folster certainly had enough information for probable cause.

Folster's determination of probable cause received further support from Stroke's confirmation that he posted inappropriate messages as recently as the previous weekend; and from Stroke's evasive comments about the intent behind those messages. Stroke then confirmed that his laptop was the sole computer that he used to post all of the messages. *Cf. United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011) ("In fact, the whole purpose of the 'knock and talk' interview was to gather enough information to procure a warrant—and the defendant provided that information in spades."). Stroke was within his rights to decline Folster's request for a consent search of the laptop, but by the time he did so, he would have been fully aware of why Folster was there in the first place and why Folster wanted to search the laptop. *Cf. United States v. Perez-Diaz*, 848 F.3d 33, 41 (1st Cir. 2017) ("The agents had asked [defendant] whether he had accidentally downloaded child pornography. They had also asked him to turn on his laptop (which, as [defendant] appears to have known, contained images of child pornography). The agents reasonably could have concluded that [defendant], consequently suspecting an imminent search, would, if given the chance, get rid of the evidence fast.") (internal quotation marks, original editorial marks, and citation omitted). Folster had reason at that point to believe that evidence of the messages remained on the laptop and would be altered or altogether destroyed if Stroke kept the laptop until the next day. *Cf. United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) (suppression required because of unreasonable delay in securing a search warrant of a computer, but initial warrantless seizure of the computer was reasonable to preserve evidence). Stroke's

attempted explanation about hacks of his AOL account, even if fully credited, would be at most a negligible detraction from the probable cause that had built up to this point. Stroke admitted ownership of the AOL account and admitted to posting at least some messages. To date, Stroke has not placed into the record any documentation of any customer service interaction with AOL regarding access to his account. (*See* Dkt. No. 46 at 38.) Seizing the laptop under the circumstances properly preserved any possible evidence until Folster could obtain a search warrant for the laptop's contents—and importantly, no law enforcement agent examined the contents of the laptop until Justice McCabe issued the first search warrant. *Cf. United States v. Ford*, No. 3:14-CR-00045-1-HZ, 2016 WL 4443171, at *8 (D. Or. Aug. 22, 2016) (officers observed a laptop being used in connection with prostitution activities and received comments confirming their observations, and thus "were justified in seizing these items to prevent destruction of incriminating evidence while they sought a warrant to search them"); *see also Riley v. California*, ___ U.S. ___, 134 S. Ct. 2473, 2486 (2014) ("[O]nce law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone."). Stroke has argued repeatedly that Folster could have secured his apartment and obtained a search and seizure warrant quickly on the same evening, perhaps by electronic means. That might be true, but as long as no law enforcement agent searched the contents of the laptop until the search warrant issued, any elapse of time between the seizure and the obtaining of the warrant is immaterial.

The Court accordingly recommends denying Stroke's motion to suppress with respect to the warrantless seizure of his laptop.

E.	*The Search Warrants*

Next, the Court will consider challenges that Stroke has made to the state and federal

warrants that issued in connection with this case.  Stroke argues that the first state search warrant

was invalid because Folster had no probable cause to believe that he sent sexually explicit photos or

files to minors:

> There was no probable cause supporting a valid warrant because the
> evidence seized was irrelevant to the referenced penal law statute, disseminating
> indecent materials to minors.  Accordingly, no reasonable belief could have existed
> that there was probable cause to seize the laptop and certainly not the storage
> devices. the officers to seize electronic storage devices.  The storage devices did not
> have the capability to broadcast any messages, therefore could not "disseminate"
> any material to anyone, let alone indecent material to minors.
>
> In NCMEC tip report # 917641, it states that zero files were uploaded.
> (Exh. A to Dkt. 35).  By that reasoning any evidence found on the Toshiba laptop
> and the other electronic devices should be suppressed for lack of probable cause
> simply because they cannot broadcast messages to communicate indecent materials;
> no files were uploaded, thus no files were stored; and were thus subject of an
> improper seizure.  The storage devices cannot establish any of the elements of the
> charges which were set forth in the original warrant application.  Anything found
> on the laptop or devices should be suppressed pursuant to the exclusionary rule.

(Dkt. No. 83 at 44.)  Stroke challenges the particularity of the warrant because of inherent privacy

issues surrounding personal documents housed on a computer.  (*Id.* at 48.)  Apart from the issues

discussed previously with Judge Preska's permanent injunction, Stroke argues that any good-faith

exception from *Leon* cannot apply because the town judge who issued the first state warrant spent

only about 14 minutes considering the application—an abdication of his duty, in Stroke's opinion.

(*Id.* at 58.)  The Government responds to the latter argument by noting that Justice McCabe

testified as part of the suppression hearing and that nothing in his testimony suggested that he gave

his responsibilities short shrift.  As for Stroke's other arguments, which touch in some way on how

to interpret Section 235.21(3), the Government asserts that the first state warrant presented and interpreted the statute in a way consistent with *People v. Kozlow*, 8 N.Y.3d 554 (2007).

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The test for probable cause is not reducible to precise definition or quantification. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable-cause decision. All we have required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act. In evaluating whether the State has met this practical and common-sensical standard, we have consistently looked to the totality of the circumstances. We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Florida v. Harris*, 568 U.S. 237, 243–44 (2013) (internal quotations and editorial marks and citations omitted). Here, Folster had AOL complaints, NCMEC reports, and statements from Stroke himself indicating that Stroke was communicating with minors in violation of Section 235.21(3) and that he was doing so using a single laptop computer. Stroke is correct that Folster had no reason to believe that any transmission of visual images occurred. "But we cannot conceive that this outcome [*i.e.*, the use of 'depict' in Article 235 of the Penal Law] was the result of a deliberate decision to limit the scope of the statute to pictorial representations, at the time that it was being expanded into the multifaceted area of computer communications. On the contrary, we think it far more likely that legislators

considered the word 'depict' broad enough in meaning to cover a wide range of indecent materials." *People v. Kozlow*, 870 N.E.2d 118, 121 (N.Y. 2007). Folster properly presented his available information to Justice McCabe. From the testimony that Justice McCabe provided (Dkt. No. 74), the Court sees no reason to be concerned about Justice McCabe's experience and training in general or the way in which he handled Folster's application in particular. Once Justice McCabe issued the first search warrant, Folster could reasonably rely on it. As for the argument about particularity, Stroke is right to raise a concern that likely will continue to evolve with the leaps and bounds in capability that technological devices keep making. *Cf. Riley* 134 S. Ct. at 2488–89 ("Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse."). "Such an invasion of a criminal defendant's privacy is inevitable, however, in almost any warranted search because in searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *United States v. Gatto*, 313 F. Supp. 3d 551, 561 (S.D.N.Y. 2018) (internal quotation marks and citations omitted). The Court thus sees no defects in the first state search warrant.

With the first state search warrant affirmed as proper, the second state search warrant and the federal warrant require only brief treatment. Folster stopped his search of the laptop shortly after encountering a video file that unambiguously depicted child pornography. By stopping his search promptly and not surveying the entire hard drive anyway, Folster properly showed "a heightened sensitivity to the particularity requirement in the context of digital searches." *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013). Folster repeated the process that he used the

48

first time to obtain the amended search warrant, and the Court sees no defect in the process used to obtain that second warrant. With the presence of child pornography confirmed on the laptop, the federal search warrants for the laptop and the other electronic devices issued with probable cause secured.

In sum, the Court finds that the state and federal search warrants rested on probable cause and contained the necessary particularity for the laptop and the electronic devices seized from Stroke. The Court accordingly recommends denying Stroke's motion to suppress for reasons related to defects in the warrants.

F.      *Albany Grand Jury Subpoenas*

Stroke has included with his motion an argument that the Government's misuse of the Albany County grand jury warrants suppression. As discussed above, Folster received assistance from the Attorney General's office in Albany to confirm that Stroke was the Internet subscriber for the IP address captured in the NCMEC reports. The assistance from the Attorney General's office consisted of subpoenas issued in the name of the Albany County grand jury to Stroke's suspected Internet service provider. A grand jury from Albany County was used for no other reason than the location in Albany of the State Police office that receives NCMEC reports. The Attorney General's office never had any intention of investigating Stroke in Albany County. From here, Stroke argues that suppression is necessary as a remedy for grand jury abuses that would lead to geographically limitless investigations in any criminal case:

> Under the theory that an investigation can begin in Albany County simply because it is where the New York ICAC Headquarters are located, Albany County would be granted the power to prosecute any similar crime no matter where it occurred, including internet crimes committed by a Buffalo resident or a crime

49

involving the internet that occurred wholly on Long Island. These scenarios would constitute a very broad jurisdictional reach. If the information supplied by the NCMEC tip was sufficient enough to warrant an investigation, it should have been sufficient enough to warrant a jurisdictional transfer. Thus, the Albany County should have immediately forwarded the case with all reports made and verified by NCMEC, to the appropriate Attorney General's office where a proper grand jury, Erie County, sits. Folster used this information, which was improperly obtained from the AOL report, in the original Town of West Seneca Search Warrant Application, (*see* exh. J to Dkt. 35, ¶ F(1)(f)), and Judge McCabe relied on this report when issuing the search warrant.

(Dkt. No. 83 at 26.) The Government responds that Stroke is attacking a matter that occurred only at the state level; that federal suppression would not be an appropriate remedy for a state violation; and that in any event, the Albany County grand jury had the authority to issue the subpoenas in question. (Dkt. No. 84 at 27–30.)

The Government has the better argument here. The scope of the Fourth Amendment does not include violations of state law in themselves. *See Virginia v. Moore*, 553 U.S. 164, 178 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law. That Amendment does not require the exclusion of evidence obtained from a constitutionally permissible arrest."). The Fourth Amendment does not reach pure state-law violations partly because states are free to add protections to the federal constitutional minimum, and "when States go above the Fourth Amendment minimum, the Constitution's protections concerning search and seizure remain the same." *Id.* at 173; *see also California v. Greenwood*, 486 U.S. 35, 43 (1988) ("We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs."); *United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) (citations omitted). To the extent that Stroke has protested about geography—that is, the involvement of the grand jury from the Albany County and

50

not Erie County—geographical issues arising under state law by themselves do not implicate the Fourth Amendment. *Cf. United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) ("Because we must examine Deputy Picou's stop of Jones under federal law, the state law administrative deficiency in his commission as Deputy Sheriff does not affect our analysis."); *see also Tucker v. Cty. of Jefferson*, 110 F. Supp. 2d 117, 123 (N.D.N.Y. 2000) ("The Fourth Amendment does not provide Plaintiff with additional protections merely because, at the time the warrant was to be executed, he was located in one county in the state as opposed to another. The federal constitution provides for a common denominator of rights to be applied across the country.") (citation omitted). Stroke has argued for suppression because the Attorney General's office never had any intention of investigating him in Albany County, regardless of the availability of the grand jury there. Even so, deliberate acts that are improper under state law do not themselves implicate the Fourth Amendment. *See United States v. Eastland*, 989 F.2d 760, 765 (5th Cir. 1993) ("The exclusionary rule is not a personal constitutional right ; but is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect. The rule was not created to discourage violations of state law.") (internal quotation and editorial marks and citations omitted); *United States v. Edwards*, 79 F. Supp. 2d 645, 651 (M.D. La. 1999). When state-level grand jury subpoenas violate state law, any evidence obtained from them does not have to be suppressed in federal court solely because of the state-law violations. *Cf. United States v. VanDyck*, No. CR 15-742-TUC-CKJ, 2016 WL 2909870, at *7 (D. Ariz. May 19, 2016) ("In essence, VanDyck complains that the grand jury subpoena was created by the detective and prosecutor, rather than the grand jury, and the state grand jury procedures were not complied with. Even if there has been

51

a violation, VanDyck has not pointed to any federal authority determining that the appropriate remedy is the exclusion of evidence rather than civil litigation.").  And all of the above analysis assumes the worst-case scenario in which Folster would have been legally obligated to obtain the subpoenas and to confirm Stroke's IP address before conducting the knock and talk interview. Folster was under no such obligation.  Confirming an Internet subscriber's identity before showing up at his apartment in a raid jacket is better investigative practice, but as the Court addressed above, a properly conducted knock and talk interview is little different than any two people having an ordinary voluntary conversation on the street.  This context gives the Court an additional reason to conclude that, whatever violations might have occurred at the state level with respect to the Albany County grand jury, any remedy available to Stroke lies elsewhere.  The Court thus recommends denying Stroke's motion to suppress with respect to any claimed grand jury irregularities.

G.      *Delay and Transfer of Property*

Two other issues raised by Stroke warrant brief consideration.  Stroke has made an argument about the length of time that passed between the seizure of his electronic devices and the application for the federal search warrant.  "The unnecessarily long retention of Mr. Stroke's nonresponsive documents create constitutional rights and a continuous threat of 'privacy violations' through overseizures."  (Dkt. No. 83 at 69.)  Stroke's concern is theoretically reasonable, but he has made no showing of an actual privacy violation that occurred.  The Court also cannot overlook that contraband was actually found on most of the electronic devices pursuant to search warrants grounded in probable cause, making the devices potential trial evidence.  *Cf. United States*

*v. Howe*, No. 09-CR-6076L, 2011 WL 2160472, at *11 (W.D.N.Y. May 27, 2011) ("A seizure cannot violate the Fourth Amendment rights of a defendant who has no constitutionally protected interest in the item seized, however, and an individual has no constitutionally recognized possessory or privacy interest in contraband.") (citations omitted), *report and recommendation adopted*, 2012 WL 1565708 (W.D.N.Y. May 1, 2012). Stroke additionally has included in his papers an argument that the transfer of his property from state to federal law enforcement agents was improper because of the lack of a turnover order and the lack of a formal inventory filed with state court. (Dkt. No. 83 at 61, 67.) In support of his argument, Stroke has cited New York Criminal Procedure Law § 690.55 and its directives for the disposition of property seized under a state search warrant. "Paying closer attention to the requirements under CPL § 690.55 is the better practice, and the Court might need to take a closer look at the issue during future warrant applications. Nonetheless, . . . raising CPL § 690.55 to the level of a safeguard of substantive rights seems like too much of a stretch without further legislative or appellate guidance as to that statute's policy objective." *United States v. O'Neill*, No. 15-CR-151W, 2016 WL 6802644, at *11 (W.D.N.Y. Nov. 17, 2016); *see also United States v. Mizrahi*, No. 80 CR. 528 MEL, 1980 WL 681433, at *3 (S.D.N.Y. Nov. 20, 1980) ("Assuming that a state statute can create an expectation of privacy protectable under the Fourth Amendment—a proposition which we find quite doubtful—nevertheless it appears that § 690.55 relates primarily, if not exclusively, to the ministerial preservation of evidence rather than the protection of privacy; thus the remedy of suppression would not be applicable even in state court.") (citation omitted). Neither of the issues that Stroke has raised warrants suppression under these circumstances.

## IV.    CONCLUSION

For all of the above reasons, the Court respectfully makes a primary and a secondary recommendation on Stroke's motion to suppress.  (Dkt. No. 35 at 19–21; Dkt. No. 83.)  The Court's primary recommendation is to grant the motion for the reasons related to Judge Preska's permanent injunction.  The secondary recommendation is to deny Stroke's motion to suppress on the basis of any argument other than the permanent injunction.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Crim P. 59(b); *see also* 28 U.S.C. § 636(b)(1).  Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted).  "Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round.  In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate,

wait to see which way the wind was blowing, and—having received an unfavorable

recommendation—shift gears before the district judge." *Paterson-Leitch Co. v. Mass. Mun. Wholesale*

*Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) (citations omitted).

SO ORDERED.

_\_\_\_ /s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED:       September 25, 2018