UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

v.

Cameron Stroke,

Defendant.

**Amended Report and
Recommendation**

14-CR-45S

## I.    PREFACE

On September 25, 2018, the Court filed two writings addressing pretrial defense motions in

this case.  One writing was a Decision and Order addressing non-dispositive motions.  (Dkt. No.

201.)  The other writing was a Report and Recommendation addressing a defense motion to

suppress.  (Dkt. No. 202.)  As will be explained below, new information emerged after the issuance

of the Report and Recommendation.  The Court reopened the suppression hearing and received

additional testimony and briefing from the parties.  The Court now issues this Amended Report and

Recommendation.  The Amended Report and Recommendation replaces the first Report and

Recommendation in its entirety.

Before moving on to substantive background and analysis, the Court wants to take a

moment to thank the attorneys for their extraordinary civility, patience, and diligence as they fleshed

out the record for this case.  This case has had an unusually long history because it features a

complex intermingling of federal and state procedural and substantive issues.  Along the way, the

attorneys put considerable effort into making sure that the Court had the best available information

before it, collaborating as needed when novel issues arose.  One side or the other inevitably will

object to the various recommendations that appear below, and counsel will do what they need to do

going forward.  For all of their work so far, though, the Court will take the step of commending the

principal attorneys by name: defense counsel James Harrington and Jesse Pyle; and Assistant United States Attorney Aaron Mango.

## II.   INTRODUCTION

Defendant Cameron Stroke ("Stroke") allegedly visited AOL and MyYearbook online discussion boards in 2009 and 2010 and posted messages encouraging girls under 18 years of age to contact him for sexually explicit communications and activity.  Other users complained about the messages, and the complaints eventually made their way to law enforcement.  A background investigation led to an interview of Stroke at his apartment by law enforcement officers on January 25, 2011.  During the interview, Stroke confirmed his ownership of a particular email address connected to the messages, confirmed that he had made online postings as recently as the previous weekend, and confirmed that a laptop sitting on his coffee table was the sole computer that he used.  Fearing possible destruction of evidence, the officers seized the laptop without a warrant and took it into their custody.  Up to this point, the officers were convinced that Stroke had violated New York Penal Law § 235.21(3), disseminating indecent material to minors in the second degree.  The officers obtained a warrant to search the contents of the laptop, on the sole basis of a violation of Section 235.21(3).  The officers allegedly found child pornography after beginning the search, prompting them to stop and to obtain a second search warrant based on child pornography.  Executing the second search warrant allegedly yielded additional evidence of child pornography.  After a transfer of the case from state to federal law enforcement, Stroke now stands charged with five counts of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

Stroke has moved to suppress evidence obtained from the laptop.  (Dkt. No. 35 at 19–21; Dkt. No. 83.)  Stroke has advanced a number of arguments in favor of suppression.  The officers lacked exigent circumstances to seize the laptop on the night of the interview.  The seizure and later

searches of the laptop were tainted by a "cumulative effect" of errors in state procedural law, including defects in certain grand-jury subpoenas that set up the January 25, 2011 interview; failure to consider an electronic search warrant instead of a warrantless seizure of the laptop; and failure to obtain permission from state court to transfer custody of the laptop to federal law enforcement agents. The most important argument that has emerged is that the entire investigation, having begun under Section 235.21(3) only, is void for having ignored a federal injunction that has prohibited enforcement of that statute anywhere in the state since 1997. Specifically, Stroke asserts that the investigation here violated the permanent injunction that District Judge Loretta Preska issued in the Southern District of New York after determining that Section 235.21(3) was unconstitutional. (*See* Appendix 1.) *See also Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997).

The Government opposes Stroke's suppression motion in all respects. The Government argues that the officers reasonably feared destruction of evidence if they had left the laptop in Stroke's possession. The Government argues further that each search of the laptop's contents followed a valid search warrant that the officers used in good faith. Additionally, the Government asserts that any purported violations of state procedural law do not in themselves implicate the Fourth Amendment. With respect to Judge Preska's injunction, the Government contends that neither the officers nor a wide array of prosecutors in Western New York ever knew about it or received any updates or training about it. Without any knowledge of the injunction, according to the Government, the officers acted in good faith in 2011 based on the state of the law in 1997. The resulting evidence thus, in the Government's view, falls under the exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984).

District Judge William M. Skretny has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 12.) For the sake of a full record, the Court entertained oral arguments,

suppression hearings, and supplemental briefing on multiple dates, with the last supplemental briefing arriving on April 2, 2019.  After considering the entirety of the record including the testimony from the suppression hearings, the Court respectfully submits two recommendations to Judge Skretny.  The Court does so for the sake of expediency, to help bring this aging case to an ultimate resolution as quickly as possible.  As a primary recommendation, the Court concludes that the evidence obtained from Stroke's laptop should be suppressed because the investigation violated Judge Preska's injunction, lacked probable cause as a result, and cannot qualify for protection under *Leon*.  Alternatively, if Judge Skretny were to decide that *Leon* does apply then the Court would recommend denial of Stroke's motion.

## III.    BACKGROUND

### A.  *Postings in AOL Message Boards*

This case concerns allegations that Stroke attempted to draw minors into sexually explicit online conversations, and that an investigation of those conversations uncovered child pornography in his possession.  While the substantive events of this case unfolded, Stroke worked as a data entry clerk for Citigroup, processing passports for the Department of State.  (Dkt. No. 46 at 5.) Defendant worked nights; his shift began at 9:30 PM and ended at 7:00 AM.  (Dkt. No. 46 at 5.)

The events of this case began with certain online postings that drew complaints.  For just a few examples, around July 2, 2010, someone with the screen name <thirteenrez> and the email address <thirteenrez@aol.com> visited an AOL message board titled "Dating younger/older" and posted a message that read, "looking for an open-minded single mommy who'd like their young daughter be given special attention 29/m/ny [sic]."  (Dkt. No. 150 at 3 (lowercase in original).)  In 2009 and 2010, someone with the screen name <sexyguy> and the email address <thirteenrez@aol.com> visited a different discussion board and posted messages such as, "hey girls,

i would love to eat out your pussy!  get at me my email is thirteenrez@aol.com" [sic] and, "im a

29/m/ny and i like younger girls . . . any girls wanna chat?  email me thirteenrez@aol.com" [sic].

(*Id.* at 6.)  An anonymous user complained to AOL on July 2, 2010 about the message from that date

quoted above.  (*Id.* at 13.)  Meanwhile, around August 4, 2010, someone with the identity

<cameron s [Age: 17] (thirteenrez@aol.com)> communicated on the MyYearbook social media

website and posted the following: "hey im cameron, im actually 29 but i like younger, u ever been

curious about bein w/an older guy? [sic]"  (*Id.* at 35.)  That posting generated a complaint from an

identified MyYearbook user in Pennsylvania.  (*Id.* at 34.)  Upon receiving the complaints, the

Internet service providers in question investigated any screen names, IP addresses, and email

addresses associated with the postings.

### B.  The Involvement of NCMEC

The complaints and other information from the Internet service providers eventually arrived

at the National Center for Missing and Exploited Children ("NCMEC").  "NCMEC [sic] what they

do is they take—take these cyber tips, and the tips could be from an anonymous person, they could

file a report online or via the phone; or it could be that a tip comes in typically from an internet

content provider, like America Online or Yahoo! or Google.  They're mandated to report when they

discover child pornography or somebody soliciting children online."  (Dkt. No. 42 at 14.)  NCMEC,

in turn, prepared four reports called CyberTipline Reports.  Report Number 917626, with an entry

date of July 2, 2010, covered certain message board postings detected from IP address 75.118.164.35

and email address <thirteenrez@aol.com>.  (*See* Dkt. No. 150 at 2–11; Dkt. No. 35-2.)  The report

contains information that NCMEC conducted an Internet search for this email address and found a

profile that contained Stroke's full name.  NCMEC conducted further email searches using Stroke's

name and email address and "found a possible target name of Cameron Stroke, a location of

Buffalo, NY and a birth date of March 22." (Dkt. No. 150 at 7.) NCMEC conducted further searches of Stroke's name and included his full birth date, age, and Social Security number in the report. The report also included two likely residential addresses. An older address, listed as current from 1999 to 2008, came from Wyoming County. The newer address, current since 2007, was Stroke's actual address and the address that was eventually visited: an address for an apartment in West Seneca, New York. The report even included a telephone number associated with the West Seneca address. A second NCMEC report, bearing Report ID 917641 and entry date of July 2, 2010, contained the same information about Stroke. (*See* Dkt. No. 150 at 12–32; Dkt. No. 35-1.) A third NCMEC report bore Report ID 930998 and an entry date of August 5, 2010. (See Dkt. No. 150 at 33–45.) This report again contained Stroke's name, email address, and birth date; it also contained a head-and-shoulders picture of Stroke. A fourth NCMEC report, with an entry date of August 11, 2010, was nearly identical to the third and bore Report ID 934370. (*See id.* at 46–57.)

### C. The Involvement of the Attorney General's Office

NCMEC transmitted its reports to New York's Internet Crimes Against Children Task Force (the "Task Force"). Every state has its own version of the Task Force to receive reports from NCMEC. The New York State Police ("State Police") runs New York's Task Force and maintains its headquarters in Albany. In general, "[o]nce Albany receives the tip they then try to determine, again, what area within New York State was the crime being committed or where it was committed at. They do a bunch of research online attempting to discover a location, and routinely they send out subpoenas in order to try to determine the location of where the suspect committed the crime." (Dkt. No. 42 at 15.)

Sometime after the State Police received the NCMEC reports, the reports made their way to the New York State Attorney General's Office in Albany. Assistant Attorney General Nancy Snyder

("Snyder") obtained the NCMEC reports and determined that she needed to verify the subscriber for both the AOL email account and the Verizon Internet connection referenced in the reports. Snyder drafted and issued two subpoenas duces tecum, in the name of an Albany County grand jury, to AOL and Verizon. The AOL subpoena was dated July 12, 2010. (Dkt. No. 150 at 94.) The AOL Legal Department responded on July 15, 2010 and confirmed that Stroke was the subscriber for the email address in the NCMEC reports. (*Id.* at 95–133.) The Verizon subpoena was dated July 23, 2010. (*Id.* at 134.) Verizon Legal Compliance responded the same day and confirmed that Stroke was the subscriber for the Internet connection and the residential address listed in the NCMEC reports. (*Id.* at 135–38.)

A few facts about the Albany County grand jury subpoenas are important to clarify here; as will be explained below, the subpoenas quietly emerged as one of the most important events in this case. State Police Investigator Scott Folster ("Folster") was the principal local investigator of the information contained in the NCMEC reports. Folster has testified that the subpoenas persuaded him to conduct the January 25, 2011 interview of Stroke. "[I]f they didn't send a subpoena out to identify a specific location for the crime, the case probably would not have been referred to our office . . . . In addition to that, we typically don't want to go to a house that may not be involved in a crime; and also we want to know for officer safety reasons that we're not going into a place that— well, we want to know who at the house has prior offenses, are there any individuals there that have a history of violence." (Dkt. No. 107 at 6–7.) Folster elaborated that the Albany County grand jury subpoenas essentially prompted his involvement in the case, given how subscriber confirmation helps screen the volume of cases that the State Police receives:

> A. NCMEC originally receives the complaint or the referral. They then discover that it appears to be possibly in the New York area. They send it to our task force in Albany, who then sends out the subpoena request.

7

Q. Okay. But that IP trace gives you the most accurate information as to the location of where the crime occurred; is that correct?

A. Yes, it gives—yes. Without that—that response back, the subpoena response back, there's no guarantee that we're going to the right location.

Anyone can lie about who they are on the internet and we don't have any knowledge that that specifically traces back to that address.

Q. Okay. So had the Albany County grand jury subpoenas not have been issued, would you have felt comfortable relying on the information in the NCMEC report that identified the defendant as a potential target?

A. I'd feel comfortable in that we would have—well, to get back to the start, we typically would not receive those types of cases. We're overwhelmed with cases and it's just something they would not send out to us unless there was a definite imminent threat to someone's safety, they just wouldn't have sent that case out.

Would I have felt comfortable going to that location just based on the information that was provided without the exact location, the definite location of Mr. Stroke's residence?

I would feel comfortable going there and talking to him. But, again, I wouldn't have known that we weren't going to the—that we were knocking on the wrong door and going and speaking to someone that wasn't involved in the case.

Q. Okay. And that IP trace gives you that information?

A. It does.

Q. When you first applied for a search warrant before Judge McCabe, did you physically present or verbally discuss the Albany County grand jury subpoenas?

A. I did not. The only information that I presented to him regarding that was what was in the search warrant application.

(*Id.* at 8–9.) Folster has testified further that information from the grand jury subpoenas made its way into both search warrant applications. (*Id.* at 10.) Folster never received any information that any criminal activity actually happened in Albany County. (Dkt. No. 42 at 77.)

The parties filed a joint stipulation on March 11, 2016 addressing two issues that the Court had raised about the Albany County grand jury subpoenas. (Dkt. No. 100.) In short, the parties stipulated that an Albany County grand jury was in session at the time when the subpoenas issued, but that the grand jury never actually reviewed any information concerning Stroke. From there, the Court has inferred that neither Snyder nor any investigators ever intended to present information about Stroke to any Albany County grand jury. (*See also* Dkt. No. 90 at 3 ("[T]here is no indication that after the case was transferred to Investigator Folster's office on July 26, 2010, that the AAG or any other law enforcement entity in Albany County remained involved in the investigation.").) The Court reasoned previously that the city of Albany, New York had no connection to this case except that the State Police office that receives NCMEC reports just happened to be located in Albany. (Dkt. No. 140 at 8–9.)

### D. The Interview of January 25, 2011

As noted above, the NCMEC reports eventually made their way to Folster, a 24-year veteran of the State Police. Folster had been assigned to the Computer Crime Unit located at Troop A headquarters in Batavia, New York. The Troop A Computer Crime Unit covers the eight westernmost counties of New York; it can initiate its own investigations but also acts on referrals from the Task Force. Folster adopted the investigation on July 28, 2010. (Dkt. No. 42 at 16–17; Dkt. No. 85 at 38.) Based on the dates of the NCMEC reports, the referral to Folster at least initially would have consisted of the first two reports.[1] Folster's began his investigation by finding some additional online postings and by attempting to contact Stroke, under cover, through his email

---

[1] Folster's memory was questionable regarding the early chronology of his investigation. Folster testified that he received the referral from the Task Force by late July 2010. He also testified that the third and fourth NCMEC reports were "included in the package that was sent to you when you started your investigation." (*See* Dkt. No. 42 at 19:18–21, 20:15–17.) That is not possible given the entry dates of the third and fourth reports.

address. When Folster received no response from Stroke by September 8, 2010, he turned the investigation over to local law enforcement. "With our office the way that we're set up, we don't fully investigate cases that come in. We bring the referrals in, we attempt to get more evidence or more background information regarding an investigation, and then we try to have either another investigator from our agency or another police department, depending on where the case is being investigated, try to turn the case over to them to investigate because we are overwhelmed with cyber tips and conducting forensics and online undercover investigations." (Dkt. No. 42 at 22.) The West Seneca Police Department agreed to take over the investigation.

On January 25, 2011, around 6:30 PM,[2] Folster went to Stroke's house to engage him in a "knock and talk" voluntary interview. Folster went with State Police Investigator John Lombardi ("Lombardi") and West Seneca Police Detective Kenneth Morano ("Morano"). The officers decided on a voluntary interview at first because they acknowledged that the initial information about Stroke had grown stale: "It had been several months since all these reports were coming in and I didn't see any additional reports come in so I wasn't sure whether he was continuing his effort or if he had stopped at that point in time." (Dkt. No. 42 at 25.) At this point, Folster already made up his mind that a crime of some sort had occurred. (*See id.* at 84.) Folster and the officers nonetheless did not believe that they had probable cause to arrest Stroke as of the beginning of the interview. "Before we went to Mr. Stroke's apartment, we had indications that a crime had occurred using an IP address that Mr. Stroke was leasing and we had indications that someone using the name Cameron Stroke, using his photograph. But other than that, we had no admissions from him that he had committed a crime; and it was possible that somebody else had committed the crime other than

---

[2] (*See also* Dkt. No. 64 at 39.) Stroke recalled the interview beginning around 7:15 PM. (Dkt. No. 46 at 41.) The Court finds that 6:30 PM was the more likely time but that the discrepancy between the parties is immaterial.

him using his name." (Dkt. No. 43 at 33.)  Given the passage of several months, Folster also wanted "to determine if he [Stroke] was still trying to seek out children online for what I believe to be—to engage in some type of sexual intercourse with these children." (Dkt. No. 42 at 24.)  Lombardi agreed that the case needed further development.  "[T]he field interview is designed that the point is that we're going out to speak to somebody at the time to gather additional information to facilitate our investigation . . . . A knock and talk is generally conducted in lieu of a search warrant if there's not information to—to gain a search warrant." (Dkt. No. 63 at 12.)

The parties are in agreement on some details of the interview.  The officers were not in uniform but had their weapons; Lombardi was wearing a "raid jacket" with lettering, and Folster and Morano might have been dressed similarly.  (Dkt. No. 63 at 44–45; *see also* Gov't Hg. Ex. 9B.)  The officers stood at the security entrance to Stroke's building and rang the doorbell for Stroke's apartment.  Stroke could have opened the security door remotely but decided to walk to the door.  Stroke could see the officers through a glass door at the security entrance.  (Dkt. No. 46 at 6.)  Lombardi showed Stroke his badge and asked if they could talk to him.  Stroke opened the door, and the officers proceeded to Stroke's apartment and to position themselves in different areas of the apartment to look around.  (Dkt. No. 46 at 8.)  Stroke testified that the interview lasted a total of about 30 minutes.  (Dkt. No. 46 at 9.)  Morano suggested that the entire interview, from the officers' appearance to their final exit, took as long as an hour and a half.  (*See* Dkt. No. 64 at 57.)  Folster and Lombardi appear to have taken lead of the interview, with Lombardi asking most of the questions (Dkt. No. 64 at 13); Morano testified that he "was there as just part of the team as an observer.  My department doesn't usually do those investigations.  I was just there for the State Police as a courtesy." (Dkt. No. 64 at 12.)

The parties have conflicting testimony about how the conversation proceeded in Stroke's apartment. According to Stroke, the officers asked whether he had made any online postings during the past weekend, without specific reference to the content or the nature of the postings. Stroke answered yes. (Dkt. No. 46 at 13.) The officers then asked no other questions but read out loud some of the online posts contained in the NCMEC reports. Stroke did not recognize any of the posts. (*See* Dkt. No. 46 at 13–14.) Stroke did not testify about being asked to identify any email addresses that he used for the online postings. On cross-examination, however, Stroke admitted at the hearing that he owned the AOL address <thirteenrez@aol.com> along with other addresses. (Dkt. No. 46 at 34.) Stroke raised some doubt about whether he maintained exclusive control of the AOL email address, claiming that he had a problem with a potential breach of the account around 2010. (*Id.* at 35–36.)

The officers had a different recollection of how the conversation unfolded. Lombardi recalled that Folster asked Stroke simply about "his online activities," and that Stroke "spontaneously said that he wouldn't do it anymore, that he would stop." (Dkt. No. 63 at 15.) According to Folster, he started by asking Stroke generally about "some online posts that he had made, and he immediately responded that he wasn't going to do it anymore and that he would stop." (Dkt. No. 42 at 26.) Morano recalled Lombardi as the questioner who prompted Stroke, testifying that "I am certain it was Investigator Lombardi who posed that—who said that to Mr. Stroke when we were in his apartment, and Mr. Stroke immediately said, 'I won't do it anymore.'" (Dkt. No. 64 at 12.) Lombardi then linked the AOL email address to the postings in the NCMEC reports; Lombardi "asked him [Stroke] what e-mail addresses he was using to make these posts and he admitted to using the thirteenrez@aol.com, in addition to a couple others." (Dkt. No. 42 at 26.) Stroke denied actual intent to meet a child, downplaying the posts as "just being stupid" (Dkt. No.

42 at 27) or just saying that he didn't know why he made them. (*See also* Dkt. No. 35-8 at 2; Dkt. No. 63 at 21 ("Q. What did he [Stroke] specifically say in response to why he made these posts? A. I believe he said he didn't know why he responded—or made those posts, and I believe at one point he—he said that he just wanted to meet women with children.").) Stroke promised that he would stop, though when asked "when was the last time that he made postings sexually soliciting children" (Dkt. No. 42 at 92) he allegedly admitted to having made those kinds of online posts as recently as the previous weekend. The officers became concerned that Stroke "was still actively seeking underage children to engage in sex with." (Dkt. No. 42 at 29.) Morano testified specifically that he had a public safety concern "that he [Stroke] may have or was about to have perhaps young girls to the house; he had convinced somebody to have a young girl [] come to the house." (Dkt. No. 64 at 16.) The officers then asked Stroke what devices he used to make his online postings. Stroke allegedly told the officers that the only device he used was the Toshiba laptop computer sitting on the coffee table in front of them. (Gov't Hg. Ex. 9A.) The laptop was not password-protected. (Dkt. No. 63 at 18.) No one else had access to Stroke's apartment or to the laptop. (Dkt. No. 42 at 28; Dkt. No. 64 at 15.)

The house visit took a different turn when the officers asked Stroke whether they could "just take a quick look" at or otherwise browse the contents stored on the laptop. The officers started focusing on the laptop once Stroke admitted that any online postings would have been made solely from that device. (*See* Dkt. No. 63 at 17 ("Q. Okay. And once—once then the defendant said that he used that specific laptop to make the posts, did you focus in at all on that specific computer? A. Yes, I did.").) When Folster asked Stroke for a look at his laptop, he already believed that it contained evidence of a crime—"[a]t the very least attempting to disseminate indecent material to a minor." (Dkt. No. 42 at 34–35.) Lombardi had the same opinion. "Based on my training and

experience I felt it was very likely that there would be information on that computer that would identify criminal conduct, and also possibly any victims or possible victims that may be in danger from someone who generally posts for the purpose of meeting with and/or conversing with children in a sexual nature." (Dkt. No. 63 at 21–22.) Stroke denied the officers permission and allegedly "appeared concerned and worried that he was in a lot of trouble." (Dkt. No. 42 at 33.) At this point, the hearing testimony does not quite line up as to what happened next. Most of the witnesses seem to be in agreement that two of the three officers stepped out of the apartment to confer while one remained in the apartment. Stroke testified that Folster and Lombardi stepped out. (Dkt. No. 46 at 15.) Lombardi corroborated Stroke's recollection when he testified that he and Folster stopped the conversation to confer about what to do in the absence of a consent search. "Investigator Folster and I did discuss how to proceed at that point and what we were going to do there at the scene . . . . The discussion—the discussion was [] how would we proceed and we cannot leave this evidence here at this point, this property here at this point for fear that it was going to be destroyed. At that point we decided that the best course of action would be to seize the computer equipment there at the scene." (Dkt. No. 63 at 23; *see also id.* at 29 ("Because of the size of the apartment and issues with Mr. Stroke overhearing us, we stepped outside the apartment to have that conversation.").) Morano, however, testified that "Investigator Lombardi asked if I would join him in the hallway and we went out in the hallway and he asked me what I was thinking as far as the computer and asking Mr. Stroke if we could look at the computer." (Dkt. No. 64 at 17; *see also id.* at 57 ("Q. Now, how long were you into the hour and a half process before you and Lombardi went out in the hall? A. At most I would say 25 minutes.") Folster made no reference at all to any meeting in the hallway and testified as if he alone seized the laptop without consultation. (*See* Dkt. No. 42 at 35–36 ("I decided that the best course of action would be to seize the computer, to

14

safeguard it from any evidence being destroyed or tampered with, so to take the evidence and go and obtain a search warrant.").) The Court credits Stroke and Lombardi's recollections; they seemed more confident about these details at the hearing, and their recollections make more sense. If Folster and Lombardi took the lead in the interview that they likely would have wanted to consult about the next step before taking any action. While Folster and Lombardi conferred in the hallway, Morano stayed at the apartment's threshold; while there, he opened a closet near the entrance, without permission, and asked Stroke why he had a shovel in there. (Dkt. No. 46 at 58.) Folster and Lombardi returned about five minutes later with a utility vest, a bag, and a digital camera. (Dkt. No. 46 at 16.) The officers tried one more time to obtain a voluntary search of the laptop, even if just for an hour. Lombardi explained that the officers pressed again for a voluntary search of the laptop "because of the nature of the evidence here and the fact that Mr. Stroke admitted to making posts, to making posts using that computer, based on my training and experience in investigations of this nature and the types of posts that Mr. Stroke admitted to making are designed to meet and interact with children in a sexual nature and I believed that information would be contained on the computer." (Dkt. No. 63 at 22.) Stroke advised the officers they would have to get a search warrant for the laptop if they wanted to browse it. At that point, Folster seized the laptop and some external storage devices without a warrant or an announcement of any rights. "I felt at that time it was the best course of action, to safeguard the—to safeguard the evidence that was there. I felt that if we had left the evidence there, there was no doubt in my mind that the evidence would have disappeared or at the very least been overwritten, wiped or destroyed." (Dkt. No. 42 at 36.) Folster knew that the New York Criminal Procedure Law ("CPL") allowed for an oral application of a search warrant; in 24 years with law enforcement, however, Folster never made an oral application for a search warrant. Folster considered an oral search warrant application to be a difficult

procedure because of the requirement to take notes or to record the application. (*See id.* at 74–75; *see also* Dkt. No. 43 at 34 ("Again, I have never applied for an oral search warrant. I have never heard of anybody that I know of that I work with ever applying for an oral search warrant . . . . I knew that if I did apply for an oral search warrant application, at the very least it was going to be multiple hours before I could complete a search warrant—write down something that I could explain to the judge for this case because there was multiple aspects involving multiple posts on multiple different days and times.").) Folster tied his decision to his prior experiences. "I had no doubt that evidence would be stored on those devices in some manner. People tend to place backup data—flash drives can be used actually as an operating system to the computer. So the computer he was using, in order for it to run, he could have plugged the flash drive in, booted the operating system from the flash drive using his laptop and then committed the crime and all of the evidence would be stored on that flash drive." (Dkt. No. 43 at 50; *see also* Dkt. No. 63 at 26 ("[I]t's general knowledge that computer peripherals in the location of the computer are readily accessed and used by someone using that computer.").) The laptop and storage devices went into State Police custody in Batavia. Although they felt the need to seize the laptop and storage devices without a warrant, the officers did not search the devices until they obtained a search warrant. Also, even though Stroke "admitted to committing the crime" (Dkt. No. 42 at 96), the officers did not obtain an arrest warrant. "Usually we want to have everything, all the evidence together before we go and make an arrest. It's very rare, unless we know absolutely for certain that the person is abusing a child there in the house that we actually make an arrest because we want to have everything together before we go and do that." (*Id.* at 99.) Folster never considered Stroke to be in custody. (Dkt. No. 43 at 56.) Folster, however, allegedly told Stroke that "whatever happens has to happen tonight. So you can either allow us to search your laptop now or you can come to the station with us now." (Dkt. No. 46 at 69; *see also id.*

at 23 ("And Folster said, 'you can either come down with us to the police station now and talk while we look at your laptop or we can look at it now.'"). ) Stroke testified that an officer held out an arm to prevent him from taking any steps forward during the seizure of the laptop. (*See* Dkt. No. 46 at 11.) Morano denied that any officer made any physical contact with Stroke (Dkt. No. 64 at 24), but the Court finds that Morano indirectly corroborated Stroke's testimony in part. Morano testified that Stroke's demeanor was very nervous and that "[h]is arms are crossed, he's biting on his hand and just focused on looking at especially that laptop and the other items that were collected that were about the apartment on the floor." (Dkt. No. 64 at 21.) Folster attempted to testify that Stroke "realized that he had been caught and that he was in a lot of trouble." (Dkt. No. 42 at 32.) That comment drew an objection that the Court sustained, but the attempt at that testimony and the preceding comment that Stroke "was a little shocked that we were there" made the impression at the hearing that Stroke had a motive to put himself between the officers and the laptop, and that the officers had a motive to prevent that from happening.

Folster and the other officers did not arrest Stroke on January 25, 2011 because they did not believe that they had probable cause to do so as of that evening. (Dkt. No. 43 at 32; Dkt. No. 64 at 52.) Folster did feel stronger, though, in his belief that Stroke committed the crime under investigation. "After speaking to Mr. Stroke and him admitting to making these postings using the e-mail address thirteenrez@aol.com, finding evidence there that he said that he—the laptop there that he said he just had made postings on and made all these postings on, I was confident at that point in time that he had committed a crime. However, as I explained earlier, typically we don't make an arrest that evening. We usually try to have everything—have a forensic examination done first and continue the investigation further." (Dkt. No. 43 at 33.)

### E. The First State Search Warrant

On January 28, 2011, around 4:00 PM, Folster and Morano went to West Seneca Town Court Justice Dale McCabe. Folster presented Justice McCabe with an application for a search warrant to search the laptop and storage devices taken from Stroke three days earlier. Folster drafted the application and focused on probable cause to believe that the laptop and storage devices contained evidence of disseminating indecent material to minors in the second degree, in violation of New York Penal Law § 235.21(3). The application made no reference to any other statute. In support of the application, Folster cited to the NCMEC reports, including alleged messages posted online that were quoted in the reports. "To me if someone says they want to talk—learn how to masturbate or assist someone with learning how to masturbate, to me that sounds like sexual content to me [for purposes of the statute]." (Dkt. No. 43 at 14.) Folster also cited to the statements that Stroke allegedly made admitting to the postings, admitting to making postings as recently as the prior weekend, and admitting to using the laptop to make the postings. (*See* Dkt. No. 150 at 63–64.) Justice McCabe issued the warrant at 4:15 PM that day. The search warrant authorized an examination of the devices for data, programs, identifying log notes, or other documents relating to or used for "disseminating indecent material to minors in the second degree, in violation of New York State Penal Law Section 235.21(3), or attempted disseminating indecent material to minors in the second degree." (*Id.* at 69–70.)

### F. The First State Search, the Second State Search Warrant, and Federal Involvement

On February 4, 2011, Folster began his search of electronic content on Stroke's laptop. Folster started with a review of the laptop's "file structure" to observe file names. "I was looking for specific things. In the first—after obtaining the first search warrant, I was looking for those files that were indicative of disseminating indecent material to a minor and/or files that showed that Mr.

Stroke had the intention to meet a child." (Dkt. No. 43 at 9.) Folster noticed "a file that had some

keywords in it that were indicative of child pornography." (Dkt. No. 42 at 52.) Folster believed that

the search warrant authorized him to view the video because

> what I was looking for was any evidence, any computer data in regards to or related
> to disseminating indecent material to a minor or attempting to disseminate indecent
> material to a minor.
>
> So that could include videos because these people that commit these types of
> crimes, from my training and experience, will video record the screen as they're
> chatting with minors, they may record chat rooms when they're in there, the
> conversations that they have. They obtain some type of gratification from doing so.

(*Id.* at 52–53.) Upon viewing the video, Folster "discovered that the video contained a video of

child pornography or sexual abuse of a child." (*Id.* at 56.) Folster realized that the search warrant

did not cover child pornography *per se*, but the exact chronology of what happened next is not clear.

Folster continued at least some of his forensic examination of the laptop under the existing warrant.

Folster testified that "I continued to look for some of that data [*i.e.*, regarding disseminating

indecent material to a minor]. I believe I found some chat logs that I exported out, but at the end of

the day I end up stopping the examination and applied for a search warrant for what I discovered

was child pornography." (*Id.* at 57; *but see id.* at 56 ("I then completed doing my forensic

examination and applied for an amended search warrant to include child pornography.").) The

application for the federal search warrant described Folster as having terminated his search after

discovering one video file, of seven minutes and 38 seconds in length, that unambiguously depicted

child pornography. (Dkt. No. 35-12 at 6–7.) Eventually, on February 8, 2011, Folster applied for

and received an amended search warrant. The amended search warrant, again from Justice McCabe,

was substantially similar to the original search warrant in all respects except to add, as an additional

basis for probable cause, the first video that Folster found on the laptop and the potential charge of

possession of a sexual performance by a child in violation of New York Penal Law § 263.16. (*See*

19

Dkt. No. 150 at 71–83.) Justice McCabe reviewed the amended search warrant application for approximately 20–30 minutes. (*See* Dkt. No. 43 at 19.) Resuming the search of the laptop and devices after the amended search warrant, Folster allegedly found evidence of possession of a sexual performance of a child. (Dkt. No. 42 at 62; Dkt. No. 43 at 30).

Around March 17, 2011, Folster contacted agents at the Federal Bureau of Investigation ("FBI") about transferring the investigation to a federal agency. On May 3, 2011, Folster transferred Stroke's laptop and devices to the FBI. Stroke never was charged with any violation of state law. Folster did not notify Justice McCabe of the transfer of property to the FBI. (Dkt. No. 74 at 24–25.) Folster also did not, under New York Criminal Procedure Law § 650(5), provide Justice McCabe with any inventory of materials found in Stroke's laptop and storage devices. Folster explained his reasoning this way:

> To me it's—when they thought about creating this statute for search warrants, they were thinking about us going out to somebody's house and seizing property and the judge wouldn't know what property was seized. In this situation with computers now, things have changed since the laws were written and, obviously, if I give the judge an application for a search warrant telling him this is the property that we have in our custody, he's aware of what property that we have . . . . [A]t what point in time is property that I see on someone's computer something that I should report back to him? Every single time I look at a file, is that something that is now in my custody and I should have to report back to him? I'm not sure where you draw the line between when the judge should be notified of what property is something that I need to report back.

(*Id.* at 23.)

The FBI took over the investigation and the file but did not take any significant further action for about two years. On August 29, 2013, federal agents obtained their own search warrants from Magistrate Judge H. Kenneth Schroeder, Jr. for the contents of the laptop and other seized devices. (*See* Dkt. No. 35-12; *see also generally* Case No. 13-MJ-127.) "In total, child pornography was found on five of the seven electronic items seized from the defendant's residence." (Dkt. No. 36 at 7.)

### G.  Credibility of Witnesses Testifying to Factual Events in the Case

At any factual hearing, the Court needs to assess the credibility of the witnesses who testified.  "The obligations of the court as the trier of fact are to determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has persuaded it as factfinder that the requisite facts are proven."  *Cifra v. G.E. Co.*, 252 F.3d 205, 215 (2d Cir. 2001).  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited.  An adverse credibility determination is appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony."  *United States v. Lawson*, 961 F. Supp. 2d 496, 504 (W.D.N.Y. 2013) (internal quotation marks and citations omitted).  "The court is also entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted).  "[A] witness's demeanor on the stand, including his or her confidence, impacts the assessment of credibility."  *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).

Here, the Court finds that the witnesses testifying to factual events in the case were generally credible, except where self-serving evasiveness became obvious.  Stroke's evasiveness concerned his failure to recognize the postings contained in the NCMEC reports and his description of whatever online activity he conducted the weekend before the interview.  Without infringing on the presumption of innocence at trial, Stroke admitted to owning the AOL email address described in the NCMEC reports; he admitted to engaging in some kind of online activity just a few days before the interview; and to date, he has not produced any documentation of any interactions with AOL customer service representatives about a possible breach of his account.[1]  In this context, and

---

[1] Stroke, to be clear, bears no burden here once he established a factual basis for his motion.  The Court

regardless of whether he explicitly made certain admissions to the officers, his inability to recognize the statements in the NCMEC reports was not credible. Stroke also was not credible to the extent that he tried to avoid any details of the "online postings" to which he admitted. If Stroke had made online postings the weekend before the interview about sports, gardening, or his favorite recipes then surely he would have said so. Stroke was not credible to the extent that he tried to claim that he could not remember where he made any unspecified postings just a few days earlier. (*See, e.g.*, Dkt. No. 46 at 53 ("I believe after he [Lombardi] asked me if I made any online postings. I said, 'yes.' And Lombardi had asked me on what websites. I told him I didn't remember.").

Meanwhile, the Court found the officers to be evasive about how much pressure they applied to Stroke in an attempt to obtain admissions and evidence. The officers testified that they wanted more information for their investigation, including enough information that would justify a search warrant if the need for one arose. The officers repeatedly pressed Stroke to admit to the entirety of the contents of the NCMEC reports. Even Stroke agrees that he made some admissions—enough to set up the legal analysis that follows below—but the suggestion at the hearing that Stroke opened up immediately with spontaneous, detailed admissions was not credible. What began as a voluntary interview effectively ended (*see* infra) as a Fourth Amendment seizure. Once the officers had admissions from Stroke that he owned the AOL email account in question and that his laptop was the sole computer used for any online postings, they had probable cause to believe that the laptop contained evidence that would confirm all of the contents of the NCMEC reports. There was no way that the officers would leave Stroke's apartment without the laptop that evening. (*See* Dkt. No. 42 at 36 ("I felt that if we had left the evidence there, there was no doubt in

notes the unsubstantiated allegation of an account breach for the limited purpose of assessing credibility of testimony at a suppression hearing.

my mind that the evidence would have disappeared or at the very least been overwritten, wiped or destroyed.").) Under those circumstances, while the officers certainly did not place Stroke in handcuffs or apply any meaningful force against him, the Court credits Stroke's testimony that they made a show of authority and prevented him from coming near the laptop anymore.

### H. This Case Begins

This case began with a pre-indictment complaint that the Government filed on January 30, 2014. (Dkt. No. 1.) In the complaint, the Government recited the online postings from the NCMEC reports and summarized both the January 25, 2011 interview and the results of the two search warrants that Folster obtained. The Government recited further that it obtained a federal search warrant on August 29, 2013 for the contents of the laptop; the Government summarized three videos that it found on the laptop that it believed constituted child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Federal agents arrested Stroke on January 31, 2014, and the Court held an initial appearance that day. (Dkt. No. 3.) Following a detention hearing, the Court released Stroke on conditions on February 3, 2014. (Dkt. No. 5.)

The Government filed an indictment against Stroke on March 4, 2014. (Dkt. No. 11.) The indictment contains five counts and a forfeiture notice. The five counts essentially are identical accusations of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B); each count corresponds to one of the electronic devices that Folster and the other officers had seized. The forfeiture notice relates to all of the electronic devices. The Court arraigned Stroke on March 10, 2014. (Dkt. No. 15.)

### I. Pending Motions

On August 4, 2014, Stroke filed omnibus pretrial motions. (Dkt. No. 35.) The motions included non-dispositive motions for discovery and various forms of relief. The motions also

included a dispositive motion to suppress any evidence obtained as a result of the Albany County grand jury subpoenas, the knock and talk interview, the state search warrants, and the federal search warrant. (*Id.* at 19–21.) The Court has addressed the non-dispositive motions through a separate Decision and Order on September 25, 2018. (Dkt. No. 201.) This Amended Report and Recommendation focuses on the suppression motion; given the extensive time and effort the parties devoted to the suppression motion, that motion deserves singular analysis and attention.

Stroke advances several arguments in favor of suppression, apart from the injunction issue that the Court will describe in the next section. Stroke argues that the Albany County grand-jury subpoenas were illegal and thus improperly helped spur the knock and talk interview. Stroke argues that exigent circumstances did not justify the warrantless seizure of his laptop and related electronic devices. Stroke argues further that the two West Seneca search warrants were improperly issued for numerous reasons, including the reliance on previous information obtained improperly; the failure to file an inventory as required by CPL § 690.50(6); and language that authorized an excessively broad search. Stroke challenges the federal search warrant as defective for several reasons, including its reliance on improperly obtained information; the improper transfer of the seized property from state to federal jurisdiction; and the length of time that passed between the transfer in 2011 and the application for the search warrant in 2013.

The Government opposes the motion for suppression in its entirety. The Government argues that the officers had exigent circumstances to seize the laptop and other devices because they established probable cause to believe that the devices contained evidence of the state charge under consideration at the time; and because they reasonably believed that the evidence would be destroyed if they waited until the next day to obtain the items. The Government defends all of the search warrants in this case as containing detailed descriptions of the property to be searched and

thus not overbroad. The Government argues further that each judge associated with the search warrants had accurate information establishing probable cause, that any missing information about possible state procedural violations did not affect probable cause, and that the officers and agents relied on the search warrants in good faith.

### J.   Section 235.21(3) and Judge Preska's Injunction

While all of the above events were occurring, another issue was flowing beneath the surface. The issue touches on the reach of federal court injunctions and the constitutionality of the statute, N.Y. Penal Law § 235.21(3), that formed the exclusive basis for Folster's first search warrant.

Understanding why the reach of federal injunctions matters requires going all the way back to 1996 in Albany and 1997 in the United States District Court for the Southern District of New York. In late 1996, the New York State legislature amended Section 235.21 to add a new subdivision three—the Section 235.21(3) at issue here. Dissemination of Indecent Material to Minors Through Any Computer Communication System, 1996 Sess. Law News of N.Y. Ch. 600 (S. 210–E) (McKinney Nov. 1, 1996) (available in Westlaw). On January 14, 1997, the American Library Association and several other plaintiffs filed suit against the New York State Attorney General (in an official capacity), in the Southern District of New York. The plaintiffs sought to enjoin enforcement of the new Section 235.21(3) on the grounds that the statute was vague and excessively broad and would ensnare both harmless communications and interstate communications, violating both the First Amendment and the Commerce Clause. On June 20, 1997, District Judge Loretta Preska agreed that Section 235.21(3) violated the Commerce Clause and issued a preliminary injunction against enforcement. *See Am. Library Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997). For purposes of the criminal case here, this Court is not concerned with why Judge Preska found fault with Section 235.21(3) in a civil case brought by librarians and magazine publishers. There are,

however, two aspects to *American Library* that do matter. First, Judge Preska decided that her injunction "would effectively bar enforcement of the Act whether the prosecution happened to be brought directly by the Attorney General's office or by one of the individual District Attorneys." 969 F. Supp. at 163. The case ended on September 2, 1997 with a permanent injunction that read as follows:

> 1. Defendant Governor George Pataki and Defendant Attorney General Dennis Vacco, and pursuant to Fed. R. Civ. P. 65(d), defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with defendants who receive actual notice of this order are PERMANENTLY ENJOINED from enforcing New York Penal Law § 235.21(3) and from prosecuting, investigating or reviewing any matter under the authority of that section; and

> 2. Defendants shall, within five days of entry of the Order, notify the sixty-two District Attorneys of the State of New York of the contents of this Order.

(S.D.N.Y. Case No. 97-CV-222, Dkt. No. 34 (attached as Appendix 1).) Second, the State of New York never appealed the preliminary or the permanent injunction. Judge Preska's permanent injunction, therefore, remains in effect. There are at least two instances when state courts acknowledged the continuing effect of the permanent injunction and vacated convictions under Section 235.21(3) accordingly. *See generally People v. Cepero*, 83 N.Y.S.3d 222 (N.Y. App. Div. 2018); *People v. Burgess*, 863 N.Y.S.2d 376 (N.Y. App. Div. 2008). District Attorneys' Offices that had obtained convictions in the face of the injunction (more on this below) have acknowledged the wrongfulness of the convictions and have notified law enforcement to stop using Section 235.21(3). *See* Phil Fairbanks, *Erie County Wrongfully Convicted 11 People—Now It's Owning Up*, Buffalo News, Dec. 7, 2018, at C21.

The permanent injunction in *American Library* came to the forefront of this case in 2017, while the Court was reviewing the papers and the testimony from Stroke's suppression hearing. Stroke included an argument that the permanent injunction in *American Library* required suppression

here because Folster had no basis to investigate anyone in 2011 under a statute that had been enjoined 14 years earlier. (Dkt. No. 89 at 7–11.) The Government had not responded specifically to this argument in its initial papers, but the Court decided that the argument needed more attention. The permanent injunction appeared to be in effect; case law suggested that the state understood the scope of the permanent injunction; and yet the New York legislature introduced a bill last year that would make only minor changes to Section 235.21(3) without acknowledging problems with constitutionality. *See* 2017 N.Y. Assembly Bill No. A07056 (Mar. 29, 2017); *see also* 2019 N.Y. Assembly Bill No. A06539 (Mar. 11, 2019). Out of concern that the constitutionality of Section 235.21(3) would have to be discussed to resolve this case, the Court invoked 28 U.S.C. § 2403(b) and invited the New York Attorney General's Office to intervene. (Dkt. No. 151.) The Attorney General's Office filed a notice of appearance on August 4, 2017 (Dkt. No. 153) but then moved to withdraw on December 11, 2017 without ever filing any substantive papers. (Dkt. No. 165.) The reason for the withdrawal is the final word about whether the permanent injunction remains in effect: "Upon further reflection and consultation within OAG, the Office has concluded that there is a substantial risk of its violating Judge Preska's injunction by making an appearance to support a prosecution that indirectly relies on Penal Law § 235.21(3), and we decline to take that risk." (*Id.* at 3.)

At Stroke's request and to maintain its caution about the possible impact of the permanent injunction, the Court reopened the suppression hearing to supplement the record to help address how Folster's investigation occurred in the face of the injunction. Folster cited only Section 235.21(3) in the first state search warrant application because "I felt that with the information that I had received regarding the case, the cyber tips, with the information that Mr. Stroke had made admissions to, I felt that it fit the particular statute." (Dkt. No. 211 at 8.) At that time, Folster felt that Section 235.21(3) was constitutional and had not heard of the injunction. (*Id.* at 9.) State Police

division counsel had a website that they would use to post "a handful" of legal updates throughout the year. (*Id.*) Prior to the use of the website, including the late 1990s, legal updates would have been disseminated by teletype and posted physically on bulletin boards at the various State Police offices or barracks. (*Id.* at 16.) Folster was not able to go as far back as 1997, but he did check about 11 years' worth of prior updates that he received and found no updates concerning *American Library.* (*Id.* at 15.) Folster never received notices from the Attorney General's Office. (*Id.* at 20.) Nonetheless, according to Folster and based on his practices, there was no way in which an update would have issued and he would have missed it. Consequently, Folster had not heard of *American Library* and the injunction until this case. Other than occasional updates that he might have received over the years, Folster's sole resource for checking New York's Penal Law was a pair of books and manuals issued to him when he graduated from the academy. (Dkt. No. 227 at 18.) The books were *Criminal Procedure Law of New York* by Gould Publications (Dkt. No. 234-3 at 1) and *Penal Law of the State of New York* by Looseleaf Law Publications (*id.* at 2). The Penal Law book comprises loose-leaf, three-hole-punched pages that were updated with supplements from time to time; that book appears to have received at least some updates through 2008. (Dkt. No. 227 at 22–23.) The Penal Law book, however, contains only statutory text. "It would show you that there was an amendment or a change made to a specific article and it would have the new page that you would insert." (*Id.* at 27.) The book does not include any text or digests of case law or injunctions affecting the statutes.

Assistant Erie County District Attorney Donna Milling also testified during supplemental proceedings. Milling had not heard of *American Library* or the permanent injunction until she received a subpoena from defense counsel to testify. Milling was not able to find any evidence that the Erie County District Attorney's Office never had been advised about the injunction. (Dkt. No.

212 at 14.)  Without commenting on the injunction, Milling believed that the *American Library*

opinion had no effect on her office:

> Well, personally speaking, this is just my opinion, this is a decision from the Second Circuit.[2]  I don't think it's binding on our office.  This statute is still on the books as we speak.  It was there this morning.  I checked before I left.  It hasn't been overruled by the [New York] Court of Appeals, and so that's just my opinion.

(*Id.* at 15.)  Under questioning from defense counsel that did not distinguish Judge Preska's opinion

from her injunction, Milling elaborated on her view of Section 235.21(3) as follows:

> My opinion is if somebody came to my office today and said I'd like to charge the defendant—I'd like to charge somebody with this crime, I would look at the penal law, it's still—it's still on the books, and I would say nothing prevents you from charging it.  I would point out that there's a Second Circuit—I mean there is a Southern District court case out there, but the [New York] Court of Appeals has not said the statute is unconstitutional.[3]

(*Id.* at 19.)  Milling diligently arranged for a records search at her office and found that, from 2005

through May 9, 2018, 25 individuals had been charged with violations of Section 235.21(3) and 11

had been convicted.  (Dkt. No. 205.)  Milling also consulted former colleagues and superiors who

worked in the office; none of them had heard of *American Library* while they worked there.  (Dkt.

No. 228 at 19.)  During Milling's testimony, the Government introduced into evidence a letter dated

November 20, 2018 from the Erie County District Attorney's Office.  (Dkt. No. 234-5.)  In the

letter, the District Attorney advises the Erie County Sheriff not to charge defendants under Section

---

[2] Likely a harmless misstatement.  *American Library* came from the Southern District of New York and never was appealed to the Second Circuit.

[3] Milling did not explain why she believed that only the New York Court of Appeals could find a state statute in violation of the federal Constitution.  Judge Preska found that Section 235.21(3) violated the federal Commerce Clause, not a provision of the New York state constitution.  *See Armstrong v. Exceptional Child Ctr., Inc.*, ___ U.S. ___, 135 S. Ct. 1378, 1383 (2015) (noting that the federal Supremacy Clause "does not create a cause of action.  It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.").

235.21(3) (and noting, correctly, that the permanent injunction does not affect enforcement of Sections 235.21(1) or (2)).

The Court heard testimony from Shannon Brundige ("Brundige"), an assistant counsel with the State Police. Brundige reiterated her response to a defense subpoena that she could not find any State Police records concerning notification about the *American Library* case. The search included legal bulletins; the State Police have maintained all legal bulletins going back to about 1990, and Brundige could not find any pertaining to *American Library*. (Dkt. No. 227 at 36.) The search also covered executive memoranda, correspondence, and special orders and directives. (*Id.* at 40–41.) Now that Brundige and others at the State Police are aware of the injunction, "we intend to put out probably a legal bulletin about this." (*Id.* at 44.)

The Court heard testimony from Robert Zucco ("Zucco"), an Assistant District Attorney with the Niagara County District Attorney's Office. Zucco had not heard of *American Library* until October 2018. (Dkt. No. 228 at 5.) Zucco researched whether his office ever received notice from the state Attorney General's Office about *American Library*. Zucco could not find evidence of any notice, and in the course of his research, he learned of one case in Niagara County indicted about two years before under Section 235.21(3). (*Id.* at 7.) The office since has determined not to prosecute any cases under Section 235.21(3). (*Id.* at 9.) When asked on cross-examination why his office needed several weeks to notify law enforcement not to enforce Section 235.21(3), Zucco responded that

> I don't think that there was ever any injunction enjoining our office from prosecuting any cases and—and with all due respect, I'm not sure that the Southern District of New York decision is—is controlling precedent to a local prosecution in the Western District of New York.

(*Id.* at 11–12.) On further cross-examination, Zucco put his prior statement about previous prosecutions in context:

30

Q. So you have no idea of any time between say 1997 and 2010 whether people were
   charged with this offense and, for example, pled guilty in a town court to a
   reduced charge for this offense, correct?

A. I could not say with any certainty that that did not happen. So it would—it could
   have happened without—without us knowing about—without me knowing
   about it, without a record of it because we just don't have records of those
   dispositions in the local courts.

(*Id*. at 16–17.)

The Court heard testimony from Michael Russo ("Russo"), an Assistant New York

Attorney General and the person in charge of the Buffalo regional office. Russo took up the task of

responding to a subpoena served by defense counsel. Russo contacted an attorney in the New York

regional office who was one of the original attorneys representing the state in *American Library*. That

attorney had no responsive documents. (Dkt. No. 213 at 14.) The Attorney General's Office, per

ordinary 10-year retention policy, destroyed its original file for *American Library* in 2009. (*Id*. at 15.)

The state archives preserved some correspondence from the office from around 1997, but none of

the preserved correspondence could confirm or deny whether the office disseminated the

permanent injunction as required by Judge Preska. (*Id*. at 15–16.) On objection from Assistant

Attorney General Christopher Boyd, who was representing Russo for purposes of the proceeding,

Russo declined to comment in any way on the validity or invalidity of the permanent injunction. (*Id*.

at 20.) Boyd noted that legal opinions come from the Attorney General's Office in Albany. Russo

did testify that he had not heard of *American Library* until the Attorney General's Office received the

subpoena from defense counsel. (*See id*. at 14, 19.)

When the Court, in its first Report and Recommendation, inferred from Russo's testimony

that the Attorney General's Office had not followed Judge Preska's directions about dissemination,

Russo redoubled his efforts to investigate the matter. Among other efforts, Russo reached out to

long-serving attorneys in District Attorney offices to determine whether any of them recalled

receiving any notices about *American Library* back in 1997. (Dkt. No. 234-6 at 5.) The Queens

County District Attorney's Office was able to retrieve a copy of what appears to be a letter, dated

July 7, 1997, to all District Attorneys from then-Attorney General Dennis Vacco. (*Id.* at 41.) The

letter contains the required notice of the permanent injunction. No representative of either the Erie

County or Niagara County District Attorney's Offices testified to having seen this letter or any

substantially similar correspondence. For the sake of correcting its prior inference, the Court credits

Russo for his diligence and is willing to accept the letter as an authentic correspondence that issued

from the Attorney General's Office. For reasons that will become apparent below, the Court need

not resolve whether or why the correspondence might have reached some District Attorneys but not

others.

## IV.     DISCUSSION: PRIMARY RECOMMENDATION

### A.  *General Burden of Proof on Suppression Motions*

"In a motion to suppress physical evidence, the burden of proof is initially on the defendant.

Once the defendant has established some factual basis for the motion, the burden shifts to the

government to show that the search was lawful." *United States v. Breckenridge*, 400 F. Supp. 2d 434,

437 (D. Conn. 2005) (citations omitted); *see also United States v. Carollo*, No. 09 CR. 1058 VM, 2011

WL 6935292, at *2 (S.D.N.Y. Dec. 30, 2011) (citations omitted). "The government has the ultimate

burden of persuasion." *United States v. Magaddino*, 496 F.2d 455, 460 (2d Cir. 1974) (citation omitted).

"The standard of proof on the party who carries the burden is preponderance of the evidence."

*United States v. Allen*, 289 F. Supp. 2d 230, 242 (N.D.N.Y. 2003) (citation omitted); *accord United States

v. Martinez*, 992 F. Supp. 2d 322, 332 (S.D.N.Y. 2014) ("On a motion to suppress, the government

bears the burden of proving the propriety of law enforcement conduct by a preponderance of the

evidence.") (citation omitted).

### B. Federal Injunctions Generally

The Court needs to begin by discussing the difference between Judge Preska's published opinion in *American Library* and the permanent injunction that followed. The Government has expended great effort mustering testimony and arguing that the published opinion in *American Library* is not binding on this Court. The Court agrees and is puzzled as to why this point keeps resurfacing. As the Court noted in its first Report and Recommendation and above, *American Library* was a civil case brought by librarians and magazine publishers. Judge Preska found fault with Section 235.21(3) based on the Commerce Clause, an analysis that has nothing to do with the issues in this criminal case. *American Library* ended at the District Court level, and the published opinions of sister District Courts are at best persuasive authority. *See, e.g., Gomez v. City of New York*, No. 16CV1274NGGLB, 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017); *Right to Life of Dutchess Cty., Inc. v. Fed. Election Comm'n*, 6 F. Supp. 2d 248, 253 (S.D.N.Y. 1998) ("Opinions bind only within a vertical hierarchy.") (internal quotation marks and citations omitted). The Court has never said otherwise. The problem that the Court faces is that the Government and several witnesses have taken this unremarkable point and expanded it to a *non sequitur*: the published opinion in *American Library* is not binding, *therefore we can ignore the separate permanent injunction that issued statewide and that was never appealed.*

A brief review of how injunctions work is warranted. An injunction "is a means by which a court tells someone what to do or not to do. When a court employs the extraordinary remedy of injunction, it directs the conduct of a party, and does so with the backing of its full coercive powers." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (internal quotation marks and citations omitted). Injunctions are enforceable through independent contempt proceedings. *See, e.g., W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757,

769 (1983) ("Courts have sufficient contempt powers to protect their injunctions, even if the injunctions are issued erroneously.") (citation omitted); *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 356 (2d Cir. 1983) ("[S]hort of modifying the injunction, the district court, of course, has a continuing obligation of enforcing the injunctive order by the power of contempt, if necessary.") (citations omitted). Injunctions cannot be understood without acknowledging their equitable nature. "It goes without saying that an injunction is an equitable remedy. It is not a remedy which issues as of course, or to restrain an act the injurious consequences of which are merely trifling." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (internal quotation marks and citations omitted); *accord Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) ("An injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable.") (citations omitted). Recognizing what injunctions are—equitable orders of restraint—necessarily points to what injunctions are *not*: legislative process. Injunctions issued against statutes do not nullify the political process that enacted the statute and do not function like a red pen crossing out text from statutory compilations. From the Supreme Court[4] down to trial judges across the country, courts frequently misunderstand this point and write of injunctions that "strike down" a statute. What courts should say when issuing an injunction against a statute is that, as a matter of equity, they are forbidding an executive from enforcing a duly enacted statute. To say otherwise is to commit the "writ-of-erasure fallacy":

> The writ-of-erasure fallacy has also led courts and elected officials to misunderstand the effect of judicial injunctions. When a court enjoins the executive from enforcing a statute, it is not suspending, revoking, or delaying the effective date

---

[4] *See, e.g., Harris v. Arizona Indep. Redistricting Comm'n*, ___ U.S. ___, 136 S. Ct. 1301, 1308 (2016) (describing an earlier case as having "struck down" a statutory provision); *but see Steffel v. Thompson*, 415 U.S. 452, 469 (1974) (noting, in the context of declaratory judgments, that "a favorable declaratory judgment may nevertheless be valuable to the plaintiff though it cannot make even an unconstitutional statute disappear.").

of that law. The statute remains in effect; the injunction simply forbids the named defendants to enforce the statute while the court's order remains in place. The injunction is nothing more than a judicially imposed non-enforcement policy, and its effect is no different from a non-enforcement policy that the executive imposes upon itself. It stops the executive from initiating enforcement proceedings while the injunction remains in effect. But it does not suspend the statute, and it does not shield those who violate the statute from future prosecution or civil penalties. If a court were to dissolve the injunction, the executive would be free to enforce the statute again—both against those who will violate it in the future and against those who have violated it in the past. The same is true when the executive repudiates a non-enforcement policy adopted by its predecessors: It is free to seek statutory penalties against past, present, and future violators of the formerly unenforced statute. No one gets an immunity from civil or criminal penalties by violating a statute at a time when the executive or the judiciary has chosen not to enforce it.

> The writ-of-erasure mindset regards a judicial injunction as a suspension of the law itself. But neither the courts nor the executive has the power to prevent a duly enacted statute from taking effect. All that a court can do is decline to enforce the statute and enjoin the executive from enforcing it.

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 986–87 (2018).

### C. The Key Questions Pertaining to Judge Preska's Injunction

Understanding how injunctions work puts the parties' positions in the right context. The New York Legislature passed Section 235.21(3) in late 1996. As far as the Court can tell, elected officials followed the necessary political process, and Section 235.21(3) entered the books and took effect. Nothing that has happened since nullified the enactment of Section 235.21(3). The Government and its witnesses are entirely correct when they say that, to this day, they can pull a book of statutory text off the shelf and find Section 235.21(3) in it. As strongly as that assertion stands, however, it also misses the point. The issue here is not deletion of Section 235.21(3) from the New York Penal Law. The issue is enforcement. In 1997, Judge Preska equitably forbade the executive branch in New York State—from the Governor and Attorney General down to the District Attorneys, and all associated officers and agents statewide—from enforcing Section 235.21(3). That prohibition has continued through the present time; no one appealed the

permanent injunction, and the Attorney General's Office does not even want to comment on it, for fear of violating it. Yet 14 years into the equitable prohibition, Stroke found himself investigated under Section 235.21(3) anyway. An unknown number of people across the state found themselves investigated as well. There are any number of questions that can be asked about how this was allowed to happen, but only a few of them pertain to whether purported evidence of federal violations should be suppressed here:

- The Attorney General's Office was explicitly within the scope of the permanent injunction. The Attorney General's Office knew that the case likely would come under Section 235.21(3), and knowingly obtained the Albany County grand-jury subpoenas to help the investigation. The Attorney General's Office thus knowingly violated the permanent injunction. Does this mean that the Attorney General's Office obtained for state and then federal law enforcement agents information that those agents would not have been able to obtain for themselves, in violation of the *Elkins* doctrine?

- Can the Government invoke *Leon* for Folster alone? The Attorney General's Office chose to become part of the initial investigation and knowingly violated a permanent injunction to provide assistance.

- Even if the Government can invoke *Leon* for Folster alone, can *Leon* apply to a systemic lack of training and updates that lasted over 14 years?

### D. *Probable Cause and the* Elkins *Doctrine*

Answering the first bullet point above requires a few steps. At all times relevant to this case, and going back to 1997, a federal injunction prohibited investigations under and enforcement of Section 235.21(3). The injunction explicitly included the Attorney General's Office and its representatives in the class of people bound by the injunction. From the letter retrieved from the Queens County District Attorney's Office, the Court knows that the Attorney General at the time, and at least some attorneys formerly working and still working in that office, knew about the injunction. The Court is not aware of any rule that says that a change of incumbent after an election dissolves a governmental office's institutional knowledge of an injunction against enforcement. By extension, then, the knowledge of the permanent injunction would be imputed to the Assistant

Attorney General who arranged to issue the Albany County grand-jury subpoenas. *Cf. Mastracchio v. Vose*, 274 F.3d 590, 600 (1st Cir. 2001) (finding that "the knowledge of other members of the attorney general's department and of the witness protection team must be imputed to the prosecuting attorney"); *F.T.C. v. Data Med. Capital, Inc.*, No. SACV 99-1266AHS(EEX), 2010 WL 1049977, at *20 (C.D. Cal. Jan. 15, 2010) (actual knowledge of a permanent injunction by a corporate agent and "*de facto* principal" is imputed to the corporation); *Shadduck v. Rodolakis*, 221 B.R. 573, 583 (D. Mass. 1998) ("Knowledge of IRS agents is properly imputed to the IRS."); *DuPree v. Walters*, 116 F.R.D. 31, 34 (S.D.N.Y. 1987) (Attorney General's knowledge of a lawsuit is imputed to a new defendant state official) (citations omitted); *United States v. Standard Oil Co.*, 136 F. Supp. 345, 362 (S.D.N.Y. 1955) ("Where an attorney is head of his office or a subdivision of it, as was Mr. Horn during part of his tenure, there is, of course, imputed to him knowledge of the proceedings taken by his juniors. This is a vertical theory of imputed knowledge well founded in rules of ultimate responsibility."). Additionally, Folster has testified that he would not have conducted the interview of January 25, 2011 without confirming the identity of the subscriber behind the IP address connected to the online postings that generated complaints. The Assistant Attorney General who arranged to issue the Albany County grand-jury subpoenas surely would have discussed the investigation with Folster and would have known why Folster wanted confirmation of subscriber information. Knowledge of the investigation thus is imputed to the individual Assistant Attorney General and to the Attorney General's Office. *Cf. United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) (noting, in the *Brady* context, that "the individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.") (citations omitted).

All of the above information comes together to show how Folster's investigation of Stroke—as it actually played out, under Section 235.21(3)—never should have happened. The permanent injunction issued 14 years before the interview of January 25, 2011. While Section 235.21(3) itself is a valid law on the books, enforcement of it was expressly prohibited, and the investigation here thus was void *ab initio*. Probable cause automatically is lacking in any investigation that requires directly defying an injunction forbidding that same investigation. *See Snider v. City of Cape Girardeau*, No. 1:10-CV-100 CEJ, 2012 WL 6553710, at *3 (E.D. Mo. Dec. 14, 2012) (finding city liable for unreasonable seizure in Section 1983 case; punitive damages not awarded on the assumption that a permanent injunction against enforcement would deter future arrests under the statute in question); *NTL, L.L.C. v. Pryor*, 128 F. Supp. 2d 1324, 1331 (N.D. Ala. 2001) (implying that an Eleventh Circuit order enjoining enforcement of a statute is in effect for those within the scope of the order). This principle is a corollary to the principle that probable cause cannot exist when a critical defect in a search warrant or statute is facially apparent at the time of investigation. *Cf. City of Los Angeles v. Patel*, ___ U.S. ___, 135 S. Ct. 2443, 2451 (2015) ("[W]e hold that [a statute making hotel guest records available for warrantless review] is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review."); *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (constitutional violation and no qualified immunity for a search warrant that lacked particularity on its face); *Ferguson v. City of Charleston*, 532 U.S. 67, 84 (2001) (Fourth Amendment violation where a state hospital's drug testing policy forwarded patients' drug tests to law enforcement without patient knowledge or consent); *Torres v. Com. of Puerto Rico*, 442 U.S. 465, 474 (1979) (suppression required where a Commonwealth statute authorized warrantless seizures). The Attorney General's Office knew that Folster's subsequent investigation could not have probable cause because of the permanent injunction. The Attorney General's Office knew also that it was

directly under the scope of the permanent injunction. Nonetheless, the office knowingly provided material assistance to an investigation prohibited by the injunction. That material assistance led to information that now is in the hands of federal agents. The federal agents would not have been able to obtain the information for themselves. The federal agents would not have investigated under Section 235.21(3); they would have violated the permanent injunction if they had enlisted the Attorney General's Office in obtaining subpoenas; and even with an opinion coming from a single District Court, they likely would not have investigated under any statute found to be unconstitutional. The scenario here thus calls for suppression under *Elkins v. United States*, 364 U.S. 206 (1960). "A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur." *Terry v. Ohio*, 392 U.S. 1, 13 (1968); *see also James P. Fleissner, Glide Path to an "Inclusionary Rule": How Expansion of the Good Faith Exception Threatens to Fundamentally Change the Exclusionary Rule*, 48 Mercer L. Rev. 1023, 1043 (1997) ("The evidence supporting the beneficial effects of the Exclusionary Rule can be contrasted with the dismal record and prospects of the alternatives. Professor Kamisar put it this way: 'The overwhelming consensus is that civil suits, criminal prosecution, *injunctions*, review boards, and internal police discipline are sadly inadequate.'") (emphasis added) (citations omitted).

### E. **Leon *Does Not Apply Because of the Attorney General's Involvement***

Of course, as the parties well know, the finding of a Fourth Amendment violation does not by itself end the analysis here. "The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Illinois v. Gates*, 462 U.S. 213, 223 (1983) (citations omitted). No bright-line rules exist, but courts

generally will not suppress "physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate." *United States v. Leon*, 468 U.S. 897, 913 (1984). The Government has insisted that *Leon* should apply to Folster's conduct leading up to the warrantless seizure of the laptop. The Court will address the reasonableness of Folster's conduct below, but there is a simpler, preliminary reason why this case does not fit the scenario that *Leon* contemplated: Folster did not act alone. As explained above, Folster needed the assistance of the Attorney General's Office to proceed with his investigation. During multiple oral arguments and hearings, the Government expended great effort emphasizing that the Attorney General's Office was a partner in the investigation because it had every right to convene a grand jury to investigate Stroke. The Government has emphasized that the Attorney General's Office had full authority to issue subpoenas in Albany County to investigate Stroke because no one ever ruled out that Stroke committed crimes in Albany County. The Government made these arguments to defeat defense motions probing technical defects in the subpoenas, but the same arguments now boomerang on the Government by elevating the Attorney General's Office to the level of an equal partner with Folster in the investigation. Consequently, an equal partner in the investigation of Stroke violated a federal injunction expressly prohibiting that very investigation. The violation of the permanent injunction eliminated any possibility of probable cause, as the Court explained above, and also raises the specter of contempt proceedings to address the violation. The Government has not cited any case law indicating that a permanent injunction barring an investigation can be violated in good faith. The scenario argued by the Government and contemplated by *Leon*—a law enforcement officer acting on his own with the best information available in the moment—thus does not exist here.

### F. Leon *Has Never Applied to a Systemic Lack of Updates Lasting 14 Years*

The way in which multiple agencies have treated the permanent injunction points to a deeper problem with applying *Leon* to this case. In *Leon*, the Supreme Court "listed four situations where the good-faith exception will not apply. They are, first, the circumstances explored in *Franks v. Delaware* [438 U.S. 154 (1978)] where the issuing magistrate has been misled by false information knowingly or recklessly conveyed by the affiant; second, where the issuing magistrate wholly abandoned his judicial role; third, where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and, finally, where the warrant is so facially deficient that the officers cannot reasonably presume it to be valid." *United States v. Moore*, 742 F. Supp. 727, 737 (N.D.N.Y. 1990) (internal quotation marks and citation omitted). *Leon* assumed that a judge presented with a warrant application will not just accept the application at face value but will conduct independent research and inquiries as needed to confirm the existence of probable cause. "A magistrate failing to manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application and who acts instead as an adjunct law enforcement officer cannot provide valid authorization for an otherwise unconstitutional search." *Leon*, 468 U.S. at 914 (internal quotation marks and citations omitted). *Leon* also emphasized the importance of finding, on a case-by-case basis, that exclusion would change undesirable individual conduct or broader systemic practices. "If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers *or the policies of their departments*." *Id.* at 918 (emphasis added). "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Herring v. United States*, 555 U.S. 135, 143 (2009). Culpability would be found where "the law enforcement officer had knowledge, *or may properly be*

*charged with knowledge*, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348–49 (1987) (emphasis added); *see also United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992) ("Reasonable reliance does not allow an officer to conduct a search with complete disregard of the warrant's validity because the standard of reasonableness is an objective one, one that requires officers to have a reasonable knowledge of what the law prohibits.") (internal quotation and editorial marks and citation omitted). Culpability also will arise from recklessness in maintaining communication systems. *See Herring*, 555 U.S. at 146 ("If the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation."); *accord United States v. Zemlyansky*, 945 F. Supp. 2d 438, 465 (S.D.N.Y. 2013) ("Deterrence is implicated where an officer engages in deliberate, reckless, or grossly negligent conduct, as well as in circumstances that demonstrate recurring or systemic negligence.") (internal quotation marks omitted). Deterrence and culpability are viewed from an objective standpoint, without regard to the subjective intent of law enforcement. *See Herring*, 555 U.S. at 145 (citations omitted).

One category of potentially undesirable conduct or practices that has been litigated many times is a mistake or change in the facts or law. Generally speaking, law enforcement agents are not expected to be lawyers who inform themselves immediately of every new case that issues. Law enforcement agents also are not faulted when they use information that they cannot reasonably verify. In these scenarios, law enforcement agents do the best they can with the best reasonably available information, and exclusion does not occur because there is no misconduct to discourage. A few examples illustrate the point:

- No exclusion where an officer based an initial arrest on an outstanding warrant. The warrant had been quashed 17 days earlier, and the administrators in charge of the records did not update the law enforcement database that the officer checked. *Arizona v. Evans*, 514 U.S. 1, 4 (1995).

- No exclusion where an officer based an initial arrest on a report from a neighboring county about an outstanding warrant. The warrant had been recalled five months earlier, but the database that had been checked was not updated. The arresting officer was alerted to the error just 15 minutes later, but the arrest had occurred already. *Herring v. United States*, 555 U.S. 135 (2009).

- No exclusion where an officer lacked reasonable suspicion for an investigatory stop. A few minutes into the stop, a dispatcher confirmed the existence of a valid warrant for a traffic violation. *Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056 (2016).

- No exclusion where an officer interpreted a provision in a state motor vehicle statute to justify a traffic stop. The appellate courts of the state had not construed the provision before, meaning that there was no settled authority contrary to the officer's interpretation. *Heien v. North Carolina*, 135 S. Ct. 530, 540 (2014).

- No exclusion when officers apply for a warrant, advise the judge of potential procedural defects, and then rely on a warrant later found invalid. "If an officer is required to accept at face value the judge's conclusion that a warrant form is invalid, there is little reason why he should be expected to disregard assurances that everything is all right, *especially when he has alerted the judge to the potential problems*." *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (emphasis added).

- No exclusion where officers relied on a state motor vehicle statute found later to be unconstitutional. *Illinois v. Krull*, 480 U.S. 340 (1987).

- No exclusion where officers relied on a warrant that gave no guidance as to the type of evidence sought. "Given the time pressures and the content of the application and the affidavit, it is only reasonable to conclude that the failure to ensure that the items to be seized were properly limited under the express terms of the warrant was simply an inadvertent error that was the product of 'isolated negligence.'" *United States v. Rosa*, 626 F.3d 56, 65 (2d Cir. 2010) (citation omitted).

- No exclusion where officers relied on Court of Appeals precedent abrogated by a subsequent Supreme Court decision or a later Court of Appeals decision. *Davis v. United States*, 564 U.S. 229 (2011); *United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017).

- No exclusion of cell site location information, where agents relied on the procedures in the Stored Communications Act, and the Supreme Court later determined that obtaining cell site location information requires a warrant. *United States v. Curtis*, 901 F.3d 846 (7th Cir. 2018).

- No exclusion of evidence from a search of a residence for firearms. The officer failed to check that a domestic violence injunction expired several months before the search, but prior convictions related to domestic violence supported probable cause objectively. Exploring the officer's state of mind is not necessary. *United States v. Franck*, No. 13-CR-133, 2013 WL 6064219, at *5 (E.D. Wis. Nov. 18, 2013).

- No exclusion where an initial arrest occurred based on a local ordinance later found to be unconstitutional. "Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). *But see Ybarra v. Illinois*, 444 U.S. 85 (1979); *Torres v. Puerto Rico*, 442 U.S. 465 (1979); *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973).

- No exclusion where a statute forming the basis of a search warrant was found unconstitutional after execution of the warrant. *United States v. Getzel*, No. CRIM.01-102-JD, 2002 WL 31114150 (D.N.H. Sept. 24, 2002).

- No exclusion where "the investigating officers in this case were operating under a 'presumptively valid' interpretation of RICO, and we do not understand the probable cause standard to require the investigating officers to know that the prevailing interpretation of a statute might eventually be held invalid or unconstitutional." *United States v. Civella*, 648 F.2d 1167, 1172 (8th Cir. 1981) (citation omitted).

- Exclusion required where an arrest occurred based on an objectively unreasonable interpretation of a traffic law. "Because the caselaw far predates the stop in this case, and because the statute facially gives no support to Officer Barrientos' interpretation of the 100-foot requirement, we conclude that his mistake of law was not objectively reasonable." *United States v. Alvarado-Zarza*, 782 F.3d 246, 250 (5th Cir. 2015).

- Exclusion required where an officer believed (possibly insincerely) that a stop sign stood at an intersection where he executed a traffic stop. No stop sign ever existed at that location. *United States v. Marshall*, No. 07-CR-153, 2008 WL 153528 (E.D. Wis. Jan. 14, 2008).

- Exclusion required where an arrest began with a traffic stop for an event—proceeding through an intersection after initially signaling an intention to turn—that is not prohibited under state or local traffic laws. The system of officer training was a problem. "Officer O'Neill testified that he has engaged in several traffic stops for failure to adhere to a turn signal, at least in part based on his instruction on [state case law]. Thus, given that Officer O'Neill has alone engaged in a number of these stops, it appears that a potentially large number of KCKPD officers may have been trained in a way that could leave them with the mistaken impression that these stops were lawful. The Government has not met its burden

44

in demonstrating that the negligence here was only 'simple' or 'isolated.'" *United States v. Perez-Madrigal*, No. 16-CR-20044-JAR, 2017 WL 2225221, at *6 (D. Kan.  May 19, 2017).

- Exclusion required where officers arrested the same person twice based on his resemblance to two different outdated wanted posters.  "In this case, the police officers' reliance on the outdated wanted poster in stopping Parker was neither the result of someone else's error nor objectively reasonable.  The error in distributing the outdated poster was not attributable to a clerk or court employee, but to the police.  Detectives in the 73rd Precinct routinely prepare the wanted posters and either hand them out to the police officers going on patrol or post them on a wall so that the officers going on patrol can make photocopies of them.  Here, they failed to remove the poster for Brian Parker after he was no longer wanted.  Moreover, there is no basis to conclude that the mistake in this case was objectively reasonable, that is, that it constituted a glitch in an otherwise reliable system.  I have heard no evidence of any system at all, so I am left to conclude that the 73rd Precinct has no mechanism to ensure that the individuals in the posters it distributes are still wanted.  The officers in this case approached Parker because he looked like a person in a wanted poster who had been arrested more than a month earlier.  The error was the fault of the police.  There is every reason to believe that the application of the exclusionary rule in such circumstances would deter the police from allowing outdated information to result in illegal seizures." *United States v. Parker*, No. 99-CR-123(JG), 1999 WL 997282, at *4 (E.D.N.Y. Oct. 18, 1999) (citation omitted).

A few patterns emerge from the above cases.  Factually, law enforcement agents will not be punished for errors that lie outside of their control, especially when they have to act quickly.  Agents have to use their training and experience to make the best observations and inferences that they can when events on the street unfold rapidly.  Agents will be faulted for failing to consult relevant databases when conducting warrant checks; they will not be faulted if other people are responsible for updating those databases and fall short on their responsibility.  On the legal side, law enforcement agents are expected to abide by statutes in force when they take action.  Agents are expected to follow established appellate court precedent.  Agents are not expected to anticipate changes in that precedent.  When a statute or case law are silent about an issue that arises on the street, law enforcement agents are allowed to make legal interpretations that are reasonable under the circumstances.  Bad training, as in *Perez-Madrigal*, or bad systems, as in *Parker*, can lead to exclusion as a spur to systemic changes.

This case fits with the cases above that ended with exclusion.  The Attorney General's Office was directly and explicitly within the scope of Judge Preska's injunction to refrain from "prosecuting, investigating or reviewing any matter under the authority" of Section 235.21(3).[5] NCMEC presented the Attorney General's Office with a case that would be brought explicitly and exclusively under Section 235.21(3).  The first steps of the investigation unfolded over several months; apart from the possible question of the warrantless seizure of the laptop, there were no exigent circumstances here.  The Attorney General's Office investigated and reviewed the case and issued grand-jury subpoenas to assist with possible prosecution.  The Government in fact has defended the Attorney General's Office right to convene a grand jury in Albany County to investigate whether Stroke violated Section 235.21(3) or other statutes there.  As explained above, the Attorney General's Office as an institution is charged with knowledge of federal injunctions against its conduct, and that knowledge is imputed to the attorneys who act on behalf of the institution.  Therefore, even if no one person in the Attorney General's Office acted maliciously or deceptively—and the Court has been given no reason to think so—the office knowingly violated the permanent injunction.  The likelihood that the Attorney General's Office issued a general memo about the injunction in 1997 does not offset the fact that the office did not tell Folster about the injunction in 2010.

Meanwhile, Folster did not know about the permanent injunction because of circumstances created by himself and the State Police.  Since graduating from his law enforcement academy over two decades ago, Folster has relied primarily on a legal reference that contains only statutory texts

---

[5] An argument could be made that Folster is one of "those persons in active concert or participation with defendants who receive actual notice of" the permanent injunction, given the regular relationship between the Attorney General's Office and the State Police when investigating NCMEC complaints.  This argument was not well developed in the record, however, and the Court does not need to pursue it to arrive at its primary recommendation.

and no digests of major cases. The State Police employs staff attorneys, and those attorneys regularly become aware of legal developments that require bulletins, but somehow no bulletin issued about a federal injunction prohibiting all enforcement of a specific statute. Claiming good-faith reliance for two decades on statutory text alone, without ever checking for court interpretation of a statute to be enforced, would be like claiming good faith when arresting a protester at a rally for disfavored speech, on the basis that the actual text of the First Amendment says that only Congress is prohibited from abridging the freedom of speech. *See generally Cantwell v. Connecticut*, 310 U.S. 296 (1940). As Stroke has argued,

> Our case is different. The statute was declared unconstitutional long before the search warrant, not after. Clearly an officer cannot claim a reasonable mistake of law if he or she knows what the law is. This raises the greater question of whose responsibility it is to inform police of changes in the law. It seems clear that police must be abreast of changes in the law. It cannot seriously be expected that police only know what the law is as of the time of their training and hiring; laws are revised and amended, new laws are added, and some laws are declared unconstitutional. How do the police find out about these changes?

(Dkt. No. 199 at 5.)

Adding to the systemic failure here, the town justice who issued the initial search warrant completely abandoned his judicial role by issuing a search warrant within 15 minutes—no exigent circumstances existed because Folster had seized the laptop by then—without even a cursory Shepard's™ or KeyCite™ check of the statute. The search warrant application contained information obtained by the Attorney General's Office when it violated the permanent injunction. And after this accretion of failures, if any doubt still remained about the need for a deterrent that would prompt a systemic review and change, the possibility of ongoing convictions under Section 235.21(3) removes that doubt. There are 11 people out there in Erie County who were convicted under Section 235.21(3) between 2005 and May 2018—convictions that never should have happened. More people in Erie County might have been convicted between 1997 and 2005. The

47

*Cepero* case, arising from a conviction in Orange County in 2014, suggests that convictions under Section 235.21(3) are still occurring around the state. Yet local prosecutors did not change course until the situation here generated negative press coverage. These circumstances have shown that no deterrent short of exclusion will force multiple institutions to take a hard look at how they could all fail at the same time, and in such a way that illegal investigations are creating illegal convictions 20 years after they needed to stop. *Leon* has never applied over so long a term to so widespread a problem. *Leon* was intended to protect the honest work of diligent law enforcement agents who use the best information that they can grab in the heat of the moment. Condoning widespread and continuing systemic failure would make a mockery of *Leon*.

The problems apparent in this case are exactly why the Court, in its first Report and Recommendation, wrote in frustration that "[t]he open and casual disregard for an enforceable federal injunction—not to put too fine a point on it—stinks." (Dkt. No. 202 at 35.) The Government has worked diligently to defend its position under *Leon*, but its arguments cannot prevail. The Government has argued that *American Library* is not binding precedent on state courts and state law enforcement agencies. (*See, e.g.,* Dkt. No. 233 at 18.) The Court agrees, and as explained above, that argument misses the point. The Attorney General's Office, state prosecutors, and state law enforcement agencies are free to form whatever opinion they like of the thoughts that Judge Preska placed on the 160th page of the 969th volume of the Federal Supplement. They are free—as they have been for 22 years—to go back to Judge Preska anytime to modify the permanent injunction or to dissolve it altogether. They are not free to blow a raspberry at an independent court order directing them not to enforce Section 235.21(3) in any way. "An injunctive order is an extraordinary writ, enforceable by the power of contempt." *Gunn v. Univ. Comm. to End War*, 399 U.S. 383, 389 (1970). As for other arguments, the Government's reliance on *Doran v. Salem Inn, Inc.*,

422 U.S. 922 (1975), is misplaced. The holding of *Doran* was that a federal District Court could not

issue a preliminary injunction that would interfere with an ongoing state prosecution for a criminal

offense that already occurred. The District Court in *Doran* was affirmed as to the preliminary

injunction that it issued for two other parties, prohibiting future enforcement of a local ordinance on

federal constitutional grounds. The affirmance in *Doran* is consistent with the scenario that Stroke

faces here. *United States v. Boles*, 914 F.3d 95 (2d Cir. 2019), was a child pornography case where the

Second Circuit applied *Leon* to a different scenario: whether law enforcement "agents acted in

reckless disregard of Boles's Fourth Amendment rights merely because they knew of a possible

staleness issue before applying for the warrant." *Id.* at 105. *Amore v. Novarro*, 624 F.3d 522 (2d Cir.

2010), does not help the Government either. In *Amore*, a City of Ithaca police officer arrested the

plaintiff for offering to perform a sexual act, in violation of a state loitering statute. The prosecutor

moved to dismiss the charge because, 18 years earlier, the New York Court of Appeals declared that

the statute violated a federal constitutional right to privacy. The plaintiff then sued the arresting

officer and the City of Ithaca for false arrest under the Fourth Amendment, by way of 42 U.S.C.

§ 1983. On appeal, the Second Circuit reversed the District Court's denial of qualified immunity to

the individual officer. Several factors make *Amore* distinguishable. First, the Second Circuit noted

that the award of qualified immunity to the individual officer "does not detract, of course, from

Amore's remaining failure-to-train claim against the City of Ithaca; indeed the facts upon which it is

based may tend to support such a claim." 624 F.3d at 535 (citations omitted). No one is trying to

punish Folster individually here, and a widespread failure to train across multiple institutions is

exactly the problem that exclusion hopefully will deter. Second, when the New York Court of

Appeals declared the loitering statute unconstitutional, it did not issue an independent statewide

injunction, punishable by contempt, that forbade law enforcement agents and prosecutors from

enforcing the statute "and from prosecuting, investigating or reviewing any matter under the authority of that section."

"Responsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules." *Davis v. United States*, 564 U.S. 229, 241 (2011) (internal quotation marks and citation omitted). One of those requirements is respect for federal injunctive authority. If federal injunctive authority is to mean anything then it has to mean something when an entire criminal justice infrastructure spends over 20 years churning out felony convictions that never should have happened. For all of the above reasons, the Court's primary recommendation in this case is to grant Stroke's motion to suppress. (Dkt. No. 35 at 19–21; Dkt. No. 83.)

## V.    DISCUSSION: SECONDARY RECOMMENDATION

Given the age of this case, the Court wants to proceed as expeditiously as possible to whatever the ultimate resolution will be. One way to move the case faster is to avoid the need for a remand for further proceedings. To that end, the Court now will present its secondary recommendation for every part of Stroke's suppression motion other than the issue of the permanent injunction. This section of the writing, Section V, will become operative if and only if Judge Skretny declines to adopt Section IV and chooses not to suppress evidence on the basis of the permanent injunction.

### A.    The Knock and Talk Interview Ended as a Fourth Amendment Seizure

The analysis of the rest of Stroke's suppression motion should move next to the knock and talk interview that occurred on January 25, 2011. The knock and talk interview marked the first event in this case that directly implicated the Fourth Amendment. If Folster lacked the appropriate

basis for visiting Stroke in the first place, or if Folster strayed outside the boundaries of a knock and talk interview, then suppression likely would be required regardless of subsequent events.

"Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (citations omitted); *accord United States v. Larson*, 63 F. App'x 416, 426 (10th Cir. 2003) (unpublished decision). "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. When the police knock on a door but the occupants choose not to respond or to speak, the investigation will have reached a conspicuously low point, and the occupants will have the kind of warning that even the most elaborate security system cannot provide. And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Kentucky v. King*, 563 U.S. 452, 469–70 (2011) (internal quotation marks and citations omitted). Some case law contains language suggesting that a knock and talk interview requires some minimum level of suspicion of criminal activity. *See United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants.") (citations omitted).[6] Nonetheless, so long as a knock and talk interview stays at the level of a consensual conversation and does not implicate

---

[6] Any ambiguity from *Tobin* probably can be resolved from context. The court in *Tobin* was comparing reasonable suspicion to probable cause and found that the law enforcement agents' reasonable suspicion was not enough for warrantless entry but more than enough—not the minimum required—for a knock and talk interview.

"curtilage" privacy rights, the law enforcement agents involved do not require any level of suspicion. *See United States v. Johnson*, 170 F.3d 708, 720 (7th Cir. 1999) ("We do not hold today that the 'knock and talk' technique is automatically unconstitutional. Nevertheless . . . the police themselves must recognize the inherent limits in this more informal way of proceeding.").

The above principles give the Court guidance as to how to assess the knock and talk interview that Folster conducted. Folster and the other officers approached Stroke's building and stopped at an outer security entrance that provided common access for all residents of the building. The approach to the outer security entrance raised no concerns about entering curtilage areas, and Stroke has not argued otherwise. Stroke himself walked to the door when the officers rang the doorbell. One of the officers did show a badge, and the officers were wearing lettered jackets, but their introduction overall did not constitute any show of force or authority. (*See* Dkt. No. 63 at 45 ("Sir, when you're knocking on a door in plain clothes you do want to make sure that the people you're speaking to can readily identify you as a law enforcement officer and that's the reason we wear a raid jacket.").) Stroke chose to open the door and to walk back to his apartment with the officers. The knock and talk interview thus began as a completely voluntary conversation. Folster and the other officers were looking for additional evidence against Stroke, but they already had some level of suspicion, close to probable cause if not quite there, that Stroke posted indecent messages online in an attempt to disseminate indecent material to minors. Until they saw the laptop, Folster and the other officers made no assertion of authority to change the tone of the conversation.

Once they saw the laptop and Stroke confirmed his use of it to post indecent messages, Folster and the other officers did change the tone of the conversation. When Folster knew that the laptop was the sole device used to post the messages, he knew that if any evidence still existed about those postings then it would be on that laptop. Folster felt that he had to secure the laptop to

preserve what evidence remained.  The Court credits the officers' testimony that, whatever the details, Stroke's demeanor changed as they pressed to obtain the laptop and Stroke resisted.  The Court, in turn, credits Stroke's testimony that Folster, told him that "whatever happens has to happen tonight.  So you can either allow us to search your laptop now or you can come to the station with us now."  (Dkt. No. 46 at 69.)  The Court credits Stroke's testimony further that one of the officers held out an arm to prevent him from taking any steps forward during the seizure of the laptop.  (*See* Dkt. No. 46 at 11.)  Once Folster asserted that he had to take action that night, and once the officers used physical restraint, albeit mild, to keep Stroke away from the laptop, a Fourth Amendment seizure occurred.  *Cf. United States v. Johnson*, 107 F. App'x 674, 677 (7th Cir. 2004) (unpublished decision) ("A seizure can occur when an officer by means of physical force or show of authority has in some way restrained the liberty of a citizen.  Courts look at the totality of the circumstances to assess whether a seizure has occurred, and one circumstance that suggests a seizure is a display of a weapon by an officer.  Another indication of a seizure is when an officer refuses to take no for an answer.")  (internal quotation and editorial marks and citations omitted); *see also United States v. Allen*, 813 F.3d 76, 86 (2d Cir. 2016) ("By advising Allen that he was under arrest, and taking control of his further movements, the officers asserted their power over him *inside his home*.  That they did so is evident if we consider what would have happened if Allen, after being told in effect that he was under arrest, had simply closed the door and retreated deeper into his home.  It is inconceivable that the officers would at that point have shrugged their shoulders and turned away.").  Folster had no warrant at this point, of course, but the Government has argued that exigent circumstances justified the actions that the officers took without a warrant.  The Court will review the argument about exigent circumstances below.

### B. The Warrantless Seizure of the Laptop

Because the knock and talk interview began without any infirmities but quickly turned into a seizure, the Court next needs to review Folster's decision to seize Stroke's laptop without a warrant. "The Fourth Amendment prohibits unreasonable searches and seizures and provides that a warrant may not be issued without probable cause, but the text of the Fourth Amendment does not specify when a search warrant must be obtained . . . . [A] warrant is generally required for a search of a home, but the ultimate touchstone of the Fourth Amendment is reasonableness. And certain categories of permissible warrantless searches have long been recognized." *Fernandez v. California*, 571 U.S. 292, 298 (2014) (internal quotation marks and citations omitted). "One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (internal quotation and editorial marks and citations omitted). "Exigent circumstances refer generally to those situations in which law enforcement officers will be unable or unlikely to effectuate an arrest, search or seizure for which probable cause exists, unless they act swiftly, even though they have not obtained prior judicial authorization." *United States v. Gallo-Roman*, 816 F.2d 76, 79 (2d Cir. 1987) (citation omitted). The test for determining whether warrantless law enforcement action had been justified by exigent circumstances "is an objective one that turns on the district court's examination of the totality of circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (citations omitted). Sometimes, the presence of solitary factors such as imminent destruction of evidence will suffice. *See Schmerber v. California*, 384 U.S. 757, 770 (1966) (citations

omitted); *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (citations omitted); *MacDonald*, 916 F.2d at 770 (citations omitted); *Gallo-Roman*, 816 F.2d at 79.

Here, circumstances justified Folster's decision to seize Stroke's laptop. By the time he saw the laptop, Folster had probable cause to believe that Stroke posted messages online in an attempt to disseminate indecent material to minors or to recruit minors for sexually inappropriate purposes. Folster conceded that he did not remember the exact language of every element of the statute in question, but Folster had a sufficient grasp of the overall statute and of the facts that eventually would support the individual elements. "A person is guilty of disseminating indecent material to minors in the second degree when . . . Knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, he intentionally uses any computer communication system allowing the input, output, examination or transfer, of computer data or computer programs from one computer to another, to initiate or engage in such communication with a person who is a minor." N.Y. Penal Law § 235.21(3). The word "depict" includes textual descriptions of sexually explicit communications. *See People v. Kozlow*, 870 N.E.2d 118, 122 (N.Y. 2007) (citations omitted). Additionally, "'Sexual conduct' means acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast." N.Y. Penal Law § 235.20(3). By the time Folster saw Stroke's laptop he had four NCMEC reports linking Stroke and his AOL email account to online postings such as the ones quoted above, plus others. Regardless of how much the parties disagree over how many of the postings Stroke explicitly admitted to writing, the testimony from the suppression hearing is consistent to the extent that Stroke had that email account, used it for at least some online postings,

and wrote all his postings from the laptop. The Government might need more at trial to establish guilt beyond a reasonable doubt, but Folster had enough information for probable cause.

Folster's determination of probable cause received further support from Stroke's confirmation that he posted inappropriate messages as recently as the previous weekend; and from Stroke's evasive comments about the intent behind those messages. Stroke then confirmed that his laptop was the sole computer that he used to post all of the messages. *Cf. United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011) ("In fact, the whole purpose of the 'knock and talk' interview was to gather enough information to procure a warrant—and the defendant provided that information in spades."). Stroke was within his rights to decline Folster's request for a consent search of the laptop, but by the time he did so, he would have been fully aware of why Folster was there in the first place and why Folster wanted to search the laptop. *Cf. United States v. Perez-Diaz*, 848 F.3d 33, 41 (1st Cir. 2017) ("The agents had asked [defendant] whether he had accidentally downloaded child pornography. They had also asked him to turn on his laptop (which, as [defendant] appears to have known, contained images of child pornography). The agents reasonably could have concluded that [defendant], consequently suspecting an imminent search, would, if given the chance, get rid of the evidence fast.") (internal quotation marks, original editorial marks, and citation omitted). Folster had reason at that point to believe that evidence of the messages remained on the laptop and would be altered or altogether destroyed if Stroke kept the laptop until the next day. *Cf. United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) (suppression required because of unreasonable delay in securing a search warrant of a computer, but initial warrantless seizure of the computer was reasonable to preserve evidence). Stroke's attempted explanation about hacks of his AOL account, even if fully credited, would be at most a negligible detraction from the probable cause that had built up to this point. Stroke admitted ownership of the AOL account and admitted to posting at least

some messages.  To date, Stroke has not placed into the record any documentation of any customer service interaction with AOL regarding access to his account.  (*See* Dkt. No. 46 at 38.)  Seizing the laptop under the circumstances preserved any possible evidence until Folster could obtain a search warrant for the laptop's contents—and importantly, no law enforcement agent examined the contents of the laptop until Justice McCabe issued the first search warrant.  *Cf. United States v. Ford*, No. 3:14-CR-00045-1-HZ, 2016 WL 4443171, at *8 (D. Or. Aug. 22, 2016) (officers observed a laptop being used in connection with prostitution activities and received comments confirming their observations, and thus "were justified in seizing these items to prevent destruction of incriminating evidence while they sought a warrant to search them"); *see also Riley v. California*, 573 U.S. 373, 388 (2014) ("[O]nce law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone.").  Stroke has argued repeatedly that Folster could have secured his apartment and obtained a search and seizure warrant quickly on the same evening, perhaps by electronic means.  That might be true, but as long as no law enforcement agent searched the contents of the laptop until the search warrant issued, any elapse of time between the seizure and the obtaining of the warrant is immaterial.

The Court accordingly recommends denying Stroke's motion to suppress with respect to the warrantless seizure of his laptop.

### C.  The Search Warrants

Next, the Court will consider challenges that Stroke has made to the state and federal warrants that issued in connection with this case.  Stroke argues that the first state search warrant was invalid because Folster had no probable cause to believe that he sent sexually explicit photos or files to minors:

> There was no probable cause supporting a valid warrant because the evidence seized was irrelevant to the referenced penal law statute, disseminating

indecent materials to minors. Accordingly, no reasonable belief could have existed that there was probable cause to seize the laptop and certainly not the storage devices. the officers to seize electronic storage devices. The storage devices did not have the capability to broadcast any messages, therefore could not "disseminate" any material to anyone, let alone indecent material to minors.

In NCMEC tip report # 917641, it states that zero files were uploaded. (Exh. A to Dkt. 35). By that reasoning any evidence found on the Toshiba laptop and the other electronic devices should be suppressed for lack of probable cause simply because they cannot broadcast messages to communicate indecent materials; no files were uploaded, thus no files were stored; and were thus subject of an improper seizure. The storage devices cannot establish any of the elements of the charges which were set forth in the original warrant application. Anything found on the laptop or devices should be suppressed pursuant to the exclusionary rule.

(Dkt. No. 83 at 44.) Stroke challenges the particularity of the warrant because of inherent privacy issues surrounding personal documents housed on a computer. (*Id.* at 48.) Apart from the issues discussed previously with Judge Preska's permanent injunction, Stroke argues that any good-faith exception from *Leon* cannot apply because the town justice who issued the first state warrant spent only about 14 minutes considering the application—an abdication of his duty, in Stroke's opinion. (*Id.* at 58.) The Government responds to the latter argument by noting that Justice McCabe testified as part of the suppression hearing and that nothing in his testimony suggested that he gave his responsibilities short shrift. As for Stroke's other arguments, which touch in some way on how to interpret Section 235.21(3), the Government asserts that the first state warrant presented and interpreted the statute in a way consistent with *People v. Kozlow*, 870 N.E.2d 118 (N.Y. 2007).

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The test for probable cause is not reducible to precise definition or quantification. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable-

58

cause decision. All we have required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act. In evaluating whether the State has met this practical and common-sensical standard, we have consistently looked to the totality of the circumstances. We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Florida v. Harris*, 568 U.S. 237, 243–44 (2013) (internal quotations and editorial marks and citations omitted). Here, Folster had AOL complaints, NCMEC reports, and statements from Stroke himself indicating that Stroke was communicating with minors in violation of Section 235.21(3) and that he was doing so using a single laptop computer. Stroke is correct that Folster had no reason to believe that any transmission of visual images occurred. "But we cannot conceive that this outcome [*i.e.*, the use of 'depict' in Article 235 of the Penal Law] was the result of a deliberate decision to limit the scope of the statute to pictorial representations, at the time that it was being expanded into the multifaceted area of computer communications. On the contrary, we think it far more likely that legislators considered the word 'depict' broad enough in meaning to cover a wide range of indecent materials." *Kozlow*, 870 N.E.2d at 121. Folster properly presented his available information to Justice McCabe. From the testimony that Justice McCabe provided (Dkt. No. 74), the Court sees no reason to be concerned about Justice McCabe's experience and training in general or the way in which he handled Folster's application in particular. Once Justice McCabe issued the first search warrant, Folster could reasonably rely on it. As for the argument about particularity, Stroke is right to raise a concern that likely will continue to evolve with the leaps and bounds in capability that technological devices keep making. *Cf. Riley*, 573 U.S. at 393 ("Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse."). "Such an invasion of a criminal defendant's privacy is inevitable, however, in almost any warranted search because in searches for papers, it is certain that

some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *United States v. Gatto*, 313 F. Supp. 3d 551, 561 (S.D.N.Y. 2018) (internal quotation marks and citations omitted). The Court thus sees no defects in the first state search warrant.

With the first state search warrant affirmed as proper, the second state search warrant and the federal warrant require only brief treatment. Folster stopped his search of the laptop shortly after encountering a video file that unambiguously depicted child pornography. By stopping his search promptly and not surveying the entire hard drive anyway, Folster properly showed "a heightened sensitivity to the particularity requirement in the context of digital searches." *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013). Folster repeated the process that he used the first time to obtain the amended search warrant, and the Court sees no defect in the process used to obtain that second warrant. With the presence of child pornography confirmed on the laptop, the federal search warrants for the laptop and the other electronic devices issued with probable cause secured.

In sum, the Court finds that the state and federal search warrants rested on probable cause and contained the necessary particularity for the laptop and the electronic devices seized from Stroke. The Court accordingly recommends denying Stroke's motion to suppress for reasons related to defects in the warrants.

### D. Procedural Challenges to Albany County Grand Jury Subpoenas

Stroke has included with his motion an argument that the Government's misuse of the Albany County grand jury warrants suppression. As discussed above, Folster worked with the Attorney General's Office in Albany to confirm that Stroke was the Internet subscriber for the IP address captured in the NCMEC reports. The assistance from the Attorney General's Office

consisted of subpoenas issued in the name of an Albany County grand jury to Stroke's suspected

Internet service provider.  A grand jury from Albany County was used for only one reason: the

location in Albany of the State Police office that receives NCMEC reports.  The Attorney General's

Office never had any intention of investigating Stroke in Albany County.  From here, Stroke argues

that suppression is necessary as a remedy for grand-jury abuses that would lead to geographically

limitless investigations in any criminal case:

> Under the theory that an investigation can begin in Albany County simply because it is where the New York ICAC Headquarters are located, Albany County would be granted the power to prosecute any similar crime no matter where it occurred, including internet crimes committed by a Buffalo resident or a crime involving the internet that occurred wholly on Long Island.  These scenarios would constitute a very broad jurisdictional reach.  If the information supplied by the NCMEC tip was sufficient enough to warrant an investigation, it should have been sufficient enough to warrant a jurisdictional transfer.  Thus, the Albany County should have immediately forwarded the case with all reports made and verified by NCMEC, to the appropriate Attorney General's office where a proper grand jury, Erie County, sits.  Folster used this information, which was improperly obtained from the AOL report, in the original Town of West Seneca Search Warrant Application, (*see* exh. J to Dkt. 35, ¶ F(1)(f)), and Judge McCabe relied on this report when issuing the search warrant.

(Dkt. No. 83 at 26.)  The Government responds that Stroke is attacking a matter that occurred only

at the state level; that federal suppression would not be an appropriate remedy for a state violation;

and that in any event, the Albany County grand jury had the authority to issue the subpoenas in

question.  (Dkt. No. 84 at 27–30.)

The Government has the better argument here.  The scope of the Fourth Amendment does

not include violations of state law in themselves.  *See Virginia v. Moore*, 553 U.S. 164, 178 (2008) ("[I]t

is not the province of the Fourth Amendment to enforce state law.  That Amendment does not

require the exclusion of evidence obtained from a constitutionally permissible arrest.").  The Fourth

Amendment does not reach pure state-law violations partly because states are free to add

protections to the federal constitutional minimum, and "when States go above the Fourth

Amendment minimum, the Constitution's protections concerning search and seizure remain the same." *Id.* at 173; *see also California v. Greenwood*, 486 U.S. 35, 43 (1988) ("We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs."); *United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) (citations omitted). To the extent that Stroke has protested about geography—that is, the involvement of the grand jury from the Albany County and not Erie County—geographical issues arising under state law by themselves do not implicate the Fourth Amendment. *Cf. United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) ("Because we must examine Deputy Picou's stop of Jones under federal law, the state law administrative deficiency in his commission as Deputy Sheriff does not affect our analysis."); *see also Tucker v. Cty. of Jefferson*, 110 F. Supp. 2d 117, 123 (N.D.N.Y. 2000) ("The Fourth Amendment does not provide Plaintiff with additional protections merely because, at the time the warrant was to be executed, he was located in one county in the state as opposed to another. The federal constitution provides for a common denominator of rights to be applied across the country.") (citation omitted). Stroke has argued for suppression because the Attorney General's Office never had any intention of investigating him in Albany County, regardless of the availability of the grand jury there. Even so, deliberate acts that are improper under state law do not themselves implicate the Fourth Amendment. *See United States v. Eastland*, 989 F.2d 760, 765 (5th Cir. 1993) ("The exclusionary rule is not a personal constitutional right, but is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect. The rule was not created to discourage violations of state law.") (internal quotation and editorial marks and citations omitted); *United States v. Edwards*, 79 F. Supp. 2d 645, 651 (M.D. La. 1999). When state-level grand jury subpoenas violate state law, any evidence obtained from them does not have to be suppressed in federal court solely because of the state-law

violations. *Cf. United States v. VanDyck*, No. CR 15-742-TUC-CKJ, 2016 WL 2909870, at *7 (D.

Ariz. May 19, 2016) ("In essence, VanDyck complains that the grand jury subpoena was created by

the detective and prosecutor, rather than the grand jury, and the state grand jury procedures were

not complied with. Even if there has been a violation, VanDyck has not pointed to any federal

authority determining that the appropriate remedy is the exclusion of evidence rather than civil

litigation."). Under these circumstances, whatever violations might have occurred at the state level

with respect to the Albany County grand jury, any remedy available to Stroke lies elsewhere. The

Court thus recommends denying Stroke's motion to suppress with respect to any claimed grand jury

irregularities.

### E.  Delay in Investigation and Transfer of Property Without Permission

Two other issues raised by Stroke warrant brief consideration. Stroke has made an argument

about the length of time that passed between the seizure of his electronic devices and the application

for the federal search warrant. "The unnecessarily long retention of Mr. Stroke's nonresponsive

documents create constitutional rights and a continuous threat of 'privacy violations' through

overseizures." (Dkt. No. 83 at 69.) Stroke's concern is theoretically reasonable, but he has made no

showing of an actual privacy violation that occurred. The Court also cannot overlook that

contraband was actually found on most of the electronic devices pursuant to search warrants

grounded in probable cause, making the devices potential trial evidence. *Cf. United States v. Howe*,

No. 09-CR-6076L, 2011 WL 2160472, at *11 (W.D.N.Y. May 27, 2011) ("A seizure cannot violate

the Fourth Amendment rights of a defendant who has no constitutionally protected interest in the

item seized, however, and an individual has no constitutionally recognized possessory or privacy

interest in contraband.") (citations omitted), *report and recommendation adopted*, 2012 WL 1565708

(W.D.N.Y. May 1, 2012). Stroke additionally has included in his papers an argument that the

transfer of his property from state to federal law enforcement agents was improper because of the lack of a turnover order and the lack of a formal inventory filed with state court. (Dkt. No. 83 at 61, 67.) In support of his argument, Stroke has cited New York Criminal Procedure Law § 690.55 and its directives for the disposition of property seized under a state search warrant. "Paying closer attention to the requirements under CPL § 690.55 is the better practice, and the Court might need to take a closer look at the issue during future warrant applications. Nonetheless, . . . raising CPL § 690.55 to the level of a safeguard of substantive rights seems like too much of a stretch without further legislative or appellate guidance as to that statute's policy objective." *United States v. O'Neill*, No. 15-CR-151W, 2016 WL 6802644, at *11 (W.D.N.Y. Nov. 17, 2016); *see also United States v. Mizrahi*, No. 80 CR. 528 MEL, 1980 WL 681433, at *3 (S.D.N.Y. Nov. 20, 1980) ("Assuming that a state statute can create an expectation of privacy protectable under the Fourth Amendment—a proposition which we find quite doubtful—nevertheless it appears that § 690.55 relates primarily, if not exclusively, to the ministerial preservation of evidence rather than the protection of privacy; thus the remedy of suppression would not be applicable even in state court.") (citation omitted). Neither of the issues that Stroke has raised warrants suppression under these circumstances.

## VI.     CONCLUSION

For all of the above reasons, the Court respectfully makes a primary and a secondary recommendation on Stroke's motion to suppress. (Dkt. No. 35 at 19–21; Dkt. No. 83.) The Court's primary recommendation is to grant the motion for the reasons related to Judge Preska's permanent injunction. The secondary recommendation is to deny Stroke's motion to suppress on the basis of any argument other than the permanent injunction.

## VII.  OBJECTIONS

A copy of this Amended Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Crim P. 59(b); *see also* 28 U.S.C. § 636(b)(1).  Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted).  "Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round.  In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge."  *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: May 2, 2019